**SO ORDERED.**

**SIGNED this 30 day of November, 2010.**



_Dale L. Somers_
Dale L. Somers
**UNITED STATES BANKRUPTCY JUDGE**

_____

**Opinion Designated for Electronic Use, But Not for Print Publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

In Re:

**TERRA BENTLEY II, LLC,**

                    **DEBTOR.**

**CASE NO. 09-23107-11**
**CHAPTER 11**

**TERRA BENTLEY II, LLC,**

                    **PLAINTIFF,**

**v.**

**VILLAGE OF OVERLAND POINTE,**
**LLC,**

                    **DEFENDANT.**

**ADV. NO. 09-6099**

**OPINION DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This proceeding is before the Court on the Defendant's motion for summary

judgment. The Defendant appears by counsel Ronald S. Weiss of Berman DeLeve Kuchan & Chapman, L.C., and Steven R. Smith of Gates, Shields & Ferguson, P.A. The Plaintiff appears by counsel James F.B. Daniels of McDowell Rice Smith & Buchanan. The Court has reviewed the relevant materials and is now ready to rule.

Before it filed for bankruptcy, Debtor Terra-Bentley II, LLC, sued Village of Overland Pointe, LLC ("Village") in a Kansas state court, and Village asserted counterclaims; both parties' claims concerned a real estate development they were involved in. After that court ruled on the parties' dispute, the Debtor appealed. Later, the Debtor filed a Chapter 11 bankruptcy petition. In this adversary proceeding, it seeks to avoid certain transfers and other actions that affected its rights in the development. Village seeks summary judgment on the ground the state court's judgment bars the claims the Debtor is asserting in this proceeding. After considering the materials presented, the Court concludes: (1) it has subject-matter jurisdiction because the Debtor's present claims do not amount to an appeal of the state court's judgment; (2) the state court judgment does not preclude the Debtor's avoidance claims because the Debtor could not have asserted the claims before that court; and (3) the state court judgment precludes the Debtor from contesting certain factual determinations, detailed below, that were made by the state court.

## Facts

Terra-Bentley II, LLC, is the Debtor in the Chapter 11 bankruptcy case to which this adversary proceeding is related. Defendant Village of Overland Pointe, LLC

2

("Village") is owned or controlled by two men, L. Gray Turner and John Sweeney, who were involved in organizing the Debtor and were its original managers.

Except where indicated, the following relevant facts are not disputed.[1] In their summary judgment pleadings, the parties have raised some factual disputes, but none of the disputes concern the content of the state court judgment. This opinion addresses the effect of the state court judgment on the claims made in this proceeding, and no factual disputes prevent this Court from deciding that question.

In 2005, Bentley Investments of Nevada IV, LLC ("Bentley IV"), and Terra Venture Investments, LLC ("Terra Venture"), formed the Debtor, dividing its ownership equally between them. At the time, Terra Venture had a contract to buy approximately 20 acres of land at the southeast corner of 135th Street and Mission Road in Leawood, Kansas, for almost $5 million. Under the Debtor's Operating Agreement, Terra Venture assigned that contract to the Debtor. Bentley IV supplied enough cash to enable the Debtor to obtain a loan to buy the 20 acres. The Debtor took out a loan, bought the property, and named the property "Mission Corner," mortgaging it as security for the loan.

The parties have skirmished a bit about the make-up of Bentley IV. Gary L. Hall signed the Debtor's Operating Agreement as "managing member" of Bentley IV, but the

---

[1]The Debtor originally objected to Village's summary judgment motion because supporting exhibits were not attached to it. Village responded that the exhibits had been omitted inadvertently and that the Debtor had agreed Village could supplement its motion by filing the exhibits separately, which it did.

Debtor says the Gary Hall Revocable Trust was Bentley IV's sole member. Village responds that so long as Hall is alive, he and the Trust are effectively one and the same. No one has said whether Hall or someone else is the trustee of the Trust. However, so far as the Court can see, none of the issues raised in Village's summary judgment motion hinge on the identity of the owners or managers of Bentley IV. Clearly, Hall had something to do with Bentley IV, but the precise nature of his connection with that company is not relevant to this decision.

As indicated, Turner and Sweeney were the Debtor's initial managers. They had a plat prepared for Mission Corner. In January 2006, the Debtor submitted an application for rezoning and approval of a preliminary site plan and preliminary plat for Mission Corner, and the City of Leawood ("the City") approved the application by an ordinance passed in May 2006. The ordinance required the Debtor to make specified road and utility improvements before any building in the Mission Corner development could be finally occupied.

In June 2006, the Debtor sold land designated as "Lot 4" in the preliminary plat to Village for a bit over $600,000. Sweeney was the only person who signed the sale contract, and he was identified as "Trustee, Member" for both the Debtor and Village.[2] Another company Turner and Sweeney owned or controlled was paid a commission of

---

[2]In the Debtor's Operating Agreement, Sweeney is identified, along with Turner, as an initial manager of the Debtor, not as a member, nor is he identified as a trustee of any sort. But the parties have ignored these discrepancies, and the Debtor concedes the sale complied with the Operating Agreement. Consequently, the discrepancies have played no part in the Court's decision.

4

about $36,000 from the proceeds of the sale, and about $567,000 was paid on the Debtor's mortgage loan. The Debtor has conceded this transaction was approved by Bentley IV and Terra Venture, as required by the Debtor's Operating Agreement. Lot 4 is surrounded by the Debtor's property, and utility easements and internal roadways to serve it would lay on or across property the Debtor owns. In prior litigation between the Debtor and Village, a Kansas state court ruled the parties intended for the Lot 4 sale agreement to require the Debtor to proceed with construction of infrastructure for the Mission Corner development, and to complete and file the final plat for the development. The state court explicitly rejected the Debtor's argument that the sale agreement should be construed to mean the parties intended that the Mission Corner property might never be developed.

In August 2006, the Debtor applied for final approval of its plat and site development plan for Mission Corner, and the City approved it in December 2006. Like the ordinance approving the preliminary application, the resolution approving the final plat and site plan required the Debtor to make specified road and utility improvements before any building there could be finally occupied.

Earlier in 2006, the Debtor had obtained an estimate of the cost, based on preliminary plans, to build the infrastructure for the Mission Corner development. The estimate was almost $2.5 million, but that was later reduced to just under $2 million because fill dirt was available from another site, and a retaining wall and water feature were eliminated. The Debtor hired a construction company to do some grading and other

5

infrastructure work, and that company obtained a grading permit late in December 2006.

In May 2007, a significant change in the Debtor's operations occurred. Paragraph 9.7 of the Debtor's Operating Agreement established a reciprocal buy-sell option for Bentley IV and Terra Venture. Under it, Bentley IV could force Terra Venture to choose either to buy Bentley IV's half of the Debtor or sell its own half to Bentley IV, and Terra Venture could do the same to Bentley IV. On May 29, 2007, Bentley IV served Terra Venture with a letter exercising this option. Terra Venture had sixty days to choose whether to buy or to sell.

On June 6, 2007, acting as the Debtor's manager, Sweeney executed five contracts purporting to sell other Mission Corner lots to Village. In later litigation, the state court ruled these contracts were invalid because they were not approved by Bentley IV, as required under the Debtor's Operating Agreement.

On July 23, 2007, shortly before Terra Venture's decision about the buy-or-sell demand was due, the Debtor and Village signed a document called the "Mission Corner Declaration of Covenants, Restrictions, Easements, Reservations and Assessments," which was filed two days later with the Johnson County Register of Deeds. Turner signed this document as a manager of the Debtor, and Sweeney signed it as a member of Village. This Declaration says when the "Developer" (who is the Debtor) sells a lot to a third party, the Developer will begin and diligently proceed with all infrastructure improvements required for a certificate of occupancy to be issued for the building to be built on the lot. The lot's buyer is to reimburse the Developer for a pro rata share of the

6

costs of all public and private infrastructure and other common improvements incurred in developing Mission Corner.

On July 27, 2007, Terra Venture chose to sell its interest in the Debtor to Bentley IV.  The Operating Agreement called for the closing on this transaction to occur within 30 days, and on August 14, Bentley IV became the sole owner of the Debtor.

In the summer of 2007, representatives of Bentley IV told the construction company they had taken over as managers of Mission Corner, and the company would no longer be dealing with Turner or Sweeney.  Later, they told the company to stop the infrastructure work on the development.  At that time, the rough grading and erosion control had been completed and some temporary fencing had been installed.  After that, the Debtor refused to take any further action to get the final plat filed or to install any infrastructure.

At the end of August 2007, the Debtor sued Village and other parties in a Kansas state court.  It alleged breach of fiduciary duties, fraud, and tortious breach of contract, and sought rescission or cancellation of the five contracts to sell lots to Village that Bentley IV had not approved.  One of the Debtor's main legal theories was that managers Turner and Sweeney had violated their fiduciary obligations to the Debtor and its members by failing to comply with:  (1) provisions in its Operating Agreement that called for any infrastructure at Mission Corner to be funded solely from the proceeds of sales of lots in the development, and (2) a later decision Bentley IV and Terra Venture had made not to engage in physical development of Mission Corner until either they sold all of

7

Mission Corner to an experienced developer or found another owner to replace Bentley IV. The Debtor did not seek to rescind the Lot 4 sale contract. Village asserted a counterclaim asking that the Debtor be required to finish platting Mission Corner, and finish the grading, roads, and utilities for the development. In July 2008, the state court issued its decision voiding the five sale contracts. Then on January 7, 2009, following a bench trial, it issued the decision that Village now relies on in its summary judgment motion.

Early in the decision, the state court noted it had previously ruled that the agreement for the sale of Lot 4 showed, as a matter of law, that the Debtor and Village intended for the final plat to be completed and filed, and for infrastructure to be built, and that the agreement obligated the Debtor to pursue those activities. The court said it had also determined the Debtor would have a reasonable time to complete the platting and build the infrastructure, but evidence would have to be presented for the court to be able to determine what a reasonable time for performance under the agreement was. If the court found the Debtor had failed to do the platting and build the infrastructure within a reasonable time, the court would have to determine the appropriate remedy.

Parts of the Mission Corner development plan included plans to build several underground parking garages, which would have cost between $6 and $9 million. In the state court litigation, the Debtor claimed these garages were part of the infrastructure the Lot 4 sale agreement required it to build, and relied on their substantial cost as evidence showing Turner and Sweeney had exceeded their limited authority to oblige the Debtor to

build Mission Corner infrastructure. Based on the evidence presented, however, the state court found the parking garages were not part of the infrastructure required for Mission Corner to be developed, or for Village to get a building permit for Lot 4.

The state court decided that a reasonable time for the Debtor to file the final plat for Mission Corner was no later than October 31, 2007, and that Village probably would have obtained a building permit for Lot 4 by that date but for the Debtor's actions. The court concluded that a reasonable time to complete the infrastructure was no later than December 31, 2007, and that Village would have completed its building on Lot 4 by approximately July 30, 2008 if the Debtor had built the necessary infrastructure.

The state court found the Debtor was obliged by the Lot 4 sale agreement to file the final plat of Mission Corner and build the infrastructure for the development. The court granted Village's request for specific performance under the agreement, and ordered the Debtor: (1) to sign and file the final plat of Mission Corner; (2) to comply with the City's ordinance approving the Debtor's preliminary plan and plat, including getting off-site road and utility improvements completed; (3) to comply with the City's ordinance approving the final plan and plat, including getting off-site road and utility improvements completed; (4) to complete all on-site infrastructure, including internal streets and all utilities; (5) to do everything specified in a letter from the City to be necessary for Village to obtain a building permit; and (6) to pay all governmental or other fees and costs required of the developer for Village to obtain a building permit. The court awarded Village $1.362 million as damages for the Debtor's delay in completing the infrastructure.

9

Finally, the court declared that the Debtor's managers had the authority to execute the Mission Corner Declaration of Covenants, Restrictions, Easements, Reservations and Assessments, so it was binding on both the Debtor and Village.

The Debtor appealed the state court's decision. The parties have presented no information about the status of this appeal.

The Debtor filed a Chapter 11 bankruptcy petition on September 18, 2009. A few days later, it filed this adversary proceeding against Village. It filed an amended complaint on October 30, 2009. In Count I of the amended complaint, the Debtor claims that under § 544(a)(3) of the Bankruptcy Code, it can avoid the final site development plan and final plat for Mission Corner because a hypothetical bona fide purchaser who bought that real property on the day the Debtor filed for bankruptcy would not be subject to either the plan or the plat because they had not been recorded with the county register of deeds, as required by K.S.A. 58-2221 and 58-2223. In Count II, the Debtor claims that under § 544(a)(1) and (a)(2),[3] it can avoid the Lot 4 sale agreement and the Mission Corner Declaration of Covenants, Restrictions, Easements, Reservations and Assessments because a judicial lien creditor or creditor who obtained an execution that was returned

---

[3] The Debtor cited § 544(a)(3) of the Bankruptcy Code in labeling Count II of its amended complaint, but in the body of the count, cited § 544 without specifying any subsection it was relying on. In its memorandum opposing Village's summary judgment motion, the Debtor alleged the Lot 4 sale agreement and the Declaration of Covenants were avoidable under § 544(a)(1) and (a)(2), not (a)(3). Docket no. 38 at 19-20. In its reply to the Debtor's response to its motion, Village stated the Debtor was claiming that the rights of a hypothetical bona fide purchaser or an unsecured creditor were not addressed in the state court litigation, Docket no. 42 at 23, but Village did not complain that it was not aware the Debtor was relying on § 544(a)(1) and (a)(2) for one of its claims. The Court concludes Village has waived any right it may have had to object to Count II on the ground it did not inform Village the claim was based on § 544(a)(1) and (a)(2).

unsatisfied on the day the Debtor filed for bankruptcy could avoid them as fraudulent transfers under K.S.A. 33-204(a)(1) and (a)(2) and K.S.A. 33-205(a). In its summary judgment motion, Village argues the state court's rulings bar both counts of the complaint.

**Discussion**

**1. Summary judgment rules**

Under the applicable rules of procedure, the Court is to grant summary judgment if the moving party demonstrates that there is "no genuine issue of material fact" and that the party "is entitled to a judgment as a matter of law."[4] The substantive law identifies which facts are material.[5] A dispute over a material fact is genuine when the evidence is such that a reasonable factfinder could resolve the dispute in favor of the party opposing the motion.[6] In adjudicating disputes, bankruptcy courts usually both determine the law and find the facts. In deciding a summary judgment motion, though, the Court is limited to its role of deciding legal questions, not weighing the evidence and resolving factual disputes, but merely determining whether the evidence favorable to the non-moving party about a material fact is sufficient to require a trial[7] at which the Court would act in its factfinding role. Summary judgment is inappropriate if an inference can be drawn from

---

[4]Fed. R. Civil P. 56(c), made applicable by Fed. R. Bankr. P. 7056.

[5]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[6]*Id.*

[7]*Id.* at 249-50.

the materials properly submitted either to support or oppose the motion that would allow the non-moving party to prevail at trial.[8]

The substantive law's allocation of the burden of proof also affects the Court's analysis of a summary judgment motion. The party asking for summary judgment has the initial burden of showing that no genuine issue of material fact exists.[9] But if the moving party does not have the burden of proof on a question, this showing requires only pointing out to the Court that the other party does not have sufficient evidence to support a finding in that party's favor on that question.[10] When such a showing is made, the party with the burden of proof must respond with affidavits, depositions, answers to interrogatories, or admissions sufficient to establish that a finding on the question could properly be made in the party's favor at trial.[11]

## 2. The Debtor's claims

As indicated, the Debtor makes two claims for relief in its amended complaint. First, it claims that under Kansas law, a bona fide purchaser of the Mission Corner property would take the property free of the final site development plan and the final plat because they are documents affecting real estate that were not recorded with the county register of deeds pursuant to K.S.A. 58-2221. K.S.A. 58-2221 provides in part: "Every

---

[8]*See id*. at 248.

[9]*Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1036 (10th Cir. 1993).

[10]*Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

[11]*Celotex,* 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

12

instrument in writing that conveys: . . . or (d) whereby any real estate may be affected . . . may be recorded in the office of the register of deeds of the county in which such real estate is situated." K.S.A. 58-2222 and 58-2223 then specify the effects of filing or failing to file an instrument affecting real estate. K.S.A. 58-2222 provides: "Every such instrument in writing . . . shall, from the time of filing . . . impart notice to all persons of the contents thereof; and all subsequent purchasers and mortgagees shall be deemed to purchase with notice." K.S.A. 58-2223 provides: "No such instrument in writing shall be valid, except between the parties thereto, and such as have actual notice thereof, until the same shall be deposited with the register of deeds for record." If these statutes apply to the final plan and final plat, a subsequent purchaser from the Debtor would not be bound by them unless the purchaser had actual notice of them.[12]

Section 544(a)(3) of the Bankruptcy Code provides:

(a)     The trustee shall have, as of the comencement of the case, and
        without regard to any knowledge of the trustee or of any creditor, the
        rights and powers of, or may avoid any transfer of property of the
        debtor or any obligation incurred by the debtor that is voidable by —
        . . .
        (3)     a bona fide purchaser of real property, other than
                fixtures, from the debtor, against whom applicable law
                permits such transfer to be perfected, that obtains the
                status of a bona fide purchaser and has perfected such
                transfer at the time of the commencement of the case,
                whether or not such a purchaser exists.

---

[12]*See, e.g., Jeremiah 29:11, Inc., v. Seifert*, 284 Kan. 468, 472-75 (2007) (under K.S.A. 58-2223, restrictive covenant in recorded deed not signed by grantees was not binding on subsequent purchasers; signatures required to give notice grantees accepted covenant); *Shlup v. Bourden*, 33 Kan. App. 2d 564, 567-71 (2005) (under K.S.A. 58-2223, covenant to provide free natural gas not binding on subsequent purchaser because deed with covenant not recorded until after purchase).

13

So if the final development plan and final plat had to be filed under K.S.A. 58-2221, 58-2222, and 58-2223, the Debtor could, under § 544(a)(3), avoid the obligations they imposed on it.

Second, the Debtor claims that under the Kansas Uniform Fraudulent Transfer Act, K.S.A. 33-201 to -212, certain types of its creditors (whether creditors of those types actually existed or not) could avoid both the Lot 4 sale agreement and the Declaration of Covenants, Restrictions, Easements, Reservations and Assessments as fraudulent transfers under K.S.A. 33-204(a)(1) and (a)(2) and 33-205(a). K.S.A. 33-204(a) provides:

> (a)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (1)    With actual intent to hinder, delay or defraud any creditor of the debtor; or
> (2)    without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> > (A)    Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > (B)    intended to incur, or believed or reasonably should have believed that such debtor would incur, debts beyond such debtor's ability to pay as they became due.

K.S.A. 33-205(a) provides:

> (a)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer

Case 09-06099   Doc# 50   Filed 11/30/10   Page 14 of 25

or obligation.

K.S.A. 33-207(a) provides that a creditor attacking a transfer or obligation may obtain avoidance of the transfer or obligation to the extent necessary to satisfy its claim, and K.S.A. 33-207(b) provides that if the creditor has a judgment against the debtor, the court may allow the creditor to levy execution on the transferred asset or its proceeds.

Section 544(a)(1) and (a)(2) authorize a debtor-in-possession like the Debtor to avoid transfers and obligations that certain creditors would be able to avoid under applicable state law. They read:

> (a)     The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by —
>
> (1)     a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; [or]
>
> (2)     a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists.

So if the Debtor can show the Lot 4 sale agreement or the Declaration of Covenants satisfied the criteria of K.S.A. 33-204(a)(1) or (a)(2), or K.S.A. 33-205(a), it can avoid those transfers under § 544(a)(1) or (a)(2).

### 3. *Rooker-Feldman* doctrine

Village argues the claims the Debtor is making in this proceeding are barred by the

15

*Rooker-Feldman* doctrine, citing a single case, one which was decided before 2005.[13]  In

2005, however, in *Exxon Mobil Corporation v. Saudi Basic Industries Corporation*,[14] the

Supreme Court said that lower courts had sometimes extended the doctrine far beyond the

contours of the *Rooker* and *Feldman* cases for which it was named.  Both *Rooker* and

*Feldman*, the Court explained, were based on the premise that Congress had given

subject-matter jurisdiction over appeals of state court judgments exclusively to the

Supreme Court, and empowered district courts to exercise only original, not appellate,

jurisdiction.[15]  By applying *Rooker-Feldman* to other situations, the Court went on, the

lower courts had improperly overridden Congress' conferral of federal-court jurisdiction

concurrent with jurisdiction exercised by state courts, and superseded the ordinary

application of preclusion law pursuant to 28 U.S.C. § 1738 (the Full Faith and Credit

Statute).  The Court ruled the doctrine was much more limited, saying:

> The *Rooker-Feldman* doctrine, we hold today, is confined to cases of
> the kind from which the doctrine acquired its name:  cases brought by
> state-court losers complaining of injuries caused by state-court judgments
> rendered before the [federal] district court proceedings commenced and
> inviting [federal] district court review and rejection of those judgments.
> *Rooker-Feldman* does not otherwise override or supplant preclusion
> doctrine or augment the circumscribed doctrines that allow federal courts to
> stay or dismiss proceedings in deference to state-court actions.[16]

---

[13]*See In re Beardslee v. Beardslee (In re Beardslee)*, 209 B.R. 1004, 1010-13 (Bankr. D. Kan. 1997).

[14]544 U.S. 280 (2005).

[15]*Id*. at 283-84.

[16]*Id*. at 284.

16

The Tenth Circuit has explained *Exxon Mobil* means that so long as a plaintiff's federal action is filed before a state court lawsuit has been finally determined, *Rooker-Feldman* cannot prevent the federal court from having subject-matter jurisdiction over the federal action.[17]

In this case, Village has not suggested the ruling in the state court lawsuit became final before the Debtor filed the complaint that commenced this adversary proceeding; the Debtor's appeal prevented the ruling from being final. Instead, Village asserted in its brief that the Debtor appealed the state trial court's judgment to the Kansas Court of Appeals without posting a supersedeas bond, and after Village sought to enforce the judgment, filed its Chapter 11 bankruptcy petition in an effort to delay complying with the trial court's orders.[18] Under such circumstances, the state court judgment is not final, and the *Rooker-Feldman* doctrine cannot apply to bar the Debtor's claims in this proceeding.

## 4. Claim preclusion

The federal Full Faith and Credit Statute[19] requires the Court to apply the preclusion law of Kansas, the state in whose courts the judgment was rendered, to determine the judgment's effect in this case.[20] But if Kansas law says that the judgment

---

[17]*Guttman v. Khalsa*, 446 F.3d 1027, 1031-32 (10th Cir. 2006).

[18]Docket no. 30 at 16.

[19]28 U.S.C.A. § 1738.

[20]*Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 379-86 (1985); *Matsushita Electric Industrial Co., Ltd., v. Epstein*, 516 U.S. 367, 373-75 (1996).

17

would have a preclusive effect here, the Court must then determine whether something else in federal law makes an exception to the Full Faith and Credit Statute for purposes of the Plaintiff's claim.[21]

The first question that arises about claim preclusion here is whether the state court judgment can be binding even though it has been appealed. Although doing so can cause some problems, the general rule federal courts follow is to give a federal judgment preclusive effect even though an appeal of the judgment is pending.[22] The Tenth Circuit has stated that Kansas also follows this general rule.[23] So despite the fact the Debtor's appeal of the judgment is pending, the state court judgment can have a preclusive effect in this case.

The next question is whether, through claim preclusion, the state court judgment prevents the Debtor from making the claims it is pursuing in this case. Under Kansas law, "[c]laim preclusion prevents parties from relitigating a cause of action that has been finally adjudicated. It is founded on the principle that the party, or some other party in privity, has litigated or had an opportunity to litigate the same matter in a former action in

---

[21]*Marresse*, 470 U.S. at 379-86; *see also National Union Fire Ins. Co. v. Boyovich (In re Boyovich)*, 126 B.R. 348, 350 (Bankr. W.D. Wash. 1991) (*Marresse* approach applies in bankruptcy proceedings).

[22]*See* 18A Wright, Miller & Cooper, *Federal Prac. & Pro.: Jurisdiction 2d*, § 4433 (2002) (stating general rule and discussing difficulties it causes); *see also* 18 Wright, Miller & Cooper, *Federal Prac. & Pro.: Jurisdiction 2d*, § 4402 (discussing terminology of res judicata and indicating treatise uses "res judicata" to refer to both claim preclusion and issue preclusion).

[23]*Phelps v. Hamilton*, 122 F.3d 1309, 1318 (10th Cir. 1997) (citing *Willard v. Ostrander*, 51 Kan. 481, 486-90 (1893); *Munn v. Gordon*, 87 Kan. 519, 521-22 (1912)).

a court of competent jurisdiction."[24]  In a 1985 decision, the Kansas Supreme Court

described claim preclusion in these terms:

> The salutary rule of res judicata forbids a suitor from twice litigating a
> claim for relief against the same party.  The rule is binding, not only as to
> every question actually presented, considered and decided, but also to every
> question which might have been presented and decided.  The doctrine of res
> judicata prevents the splitting of a single cause of action or claim into two
> or more suits; it requires that all the grounds or theories upon which a cause
> of action or claim is founded be asserted in one action or they will be barred
> in any subsequent action.[25]

More recently, the court described the doctrine in these terms:

> "The doctrine of res judicata (or claim preclusion) prohibits a party from
> asserting in a second lawsuit any matter that might have been asserted in the
> first lawsuit."  *Stanfield,* 263 Kan. at 397, 949 P.2d 602.  Res judicata
> prevents relitigation where the following requirements are met:
> "'(1) identity in the thing sued for, (2) identity of the cause of action,
> (3) identity of persons and parties to the action, and (4) identity in the
> quality of persons for or against whom claim is made.'"  *Waterview
> Resolution Corp. v. Allen,* 274 Kan. 1016, 1023, 58 P.3d 1284 (2002)
> (quoting *Regency Park v. City of Topeka,* 267 Kan. 465, 478, 981 P.2d 256
> [1999]).[26]

Village concedes the Debtor did not try to avoid the Lot 4 sale agreement as a

fraudulent transfer in the state court lawsuit, but contends the Debtor could have done so.

However, K.S.A. 33-204(a)(1) and (a)(2), and K.S.A. 33-205(a) all concern actual or

constructive fraud on a debtor's creditors, and K.S.A. 33-207 allows a creditor to recover

or avoid a transfer or obligation that violated one of those provisions.  Village has not

---

[24]*Jackson Track Group, Inc., v. Mid States Port Authority*, 242 Kan. 683, 690 (1988).

[25]*In re Estate of Reed*, 236 Kan. 514, 519 (1985) (citations omitted).

[26]*Winkel v. Miller*, 288 Kan. 455, 468 (2009).

19

pointed to anything in the Kansas Uniform Fraudulent Transfer Act that authorizes a debtor itself to avoid a transfer it made or obligation it incurred. The UFTA authorizes only a creditor of the Debtor to do so. The same thing is true of the Debtor's present effort to avoid the Declaration of Covenants under § 544(a)(1) and (a)(2). Village has not identified any claim the Debtor could have asserted under the UFTA that would have enabled it to avoid the obligations it incurred in that document.

But when the Debtor filed its bankruptcy petition, the Bankruptcy Code authorized it to pursue some claims it previously had no right to make. Section 1107(a) authorized the Debtor as the debtor-in-possession in its bankruptcy case to exercise certain powers of a Chapter 11 trustee, such as to try to avoid transfers under § 544(a). Claims like that were not available to the Debtor before it filed for bankruptcy. Furthermore, in its capacity as the debtor-in-possession, the Debtor is not the same "quality of person" it was when it was acting only on its own behalf in the state court litigation.

Essentially the same analysis applies to the Debtor's claims to avoid the final development plan and the final plat for Mission Corner under § 544(a)(3). K.S.A. 58-2223 specifically provides that an unrecorded document affecting real estate is still valid with respect to the parties to the document. In the state court lawsuit, the Debtor had no claim to invalidate the plan and plat on the ground they had not been recorded. It can make that claim now only because the Bankruptcy Code authorizes it to assert the rights a hypothetical bona fide purchaser of the Mission Corner real property would have to defeat the plan and plat because they were not recorded. The Debtor had no right to

20

assert such claims before it filed for bankruptcy. In addition, the Bankruptcy Code made the Debtor a debtor-in-possession, a capacity it did not have before filing for bankruptcy.

In short, under Kansas claim preclusion law, the state court judgment does not preclude the Debtor from asserting the claims it is making in this proceeding. Since the judgment has no claim-preclusive effect, the Court need not consider whether anything else in federal law makes an exception to the Full Faith and Credit Statute for the Debtor's claims.

## 5. Issue preclusion

As was true for claim preclusion, the federal Full Faith and Credit Statute[27] requires the Court to apply the issue preclusion law of Kansas, the state in whose courts the judgment was rendered, to determine the judgment's effect in this case.[28] But if Kansas law says that the judgment would have a preclusive effect here, the Court must then determine whether something else in federal law makes an exception to the Full Faith and Credit Statute for purposes of the Plaintiff's claim.[29] Also, as indicated in discussing claim preclusion, the fact the Debtor's appeal of the state court judgment is still pending does not, under Kansas law, prevent the judgment from precluding relitigation of specific issues decided by the state court.

---

[27]28 U.S.C.A. § 1738.

[28]*Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 379-86 (1985); *Matsushita Electric Industrial Co., Ltd., v. Epstein*, 516 U.S. 367, 373-75 (1996).

[29]*Marrese*, 470 U.S. at 379-86; *see also National Union Fire Ins. Co. v. Boyovich (In re Boyovich)*, 126 B.R. 348, 350 (Bankr. W.D. Wash. 1991) (*Marresse* approach applies in bankruptcy proceedings).

21

Under Kansas law,

> The requirements of collateral estoppel [also known as issue preclusion] are: (1) a prior judgment on the merits which determined the rights and liabilities of the parties on the issue based upon the ultimate facts as disclosed by the pleadings and judgment; (2) the parties must be the same or in privity; and (3) the issue litigated must have been determined and necessary to support the judgment. [Citation omitted.][30]

The claims the Debtor is pursuing now concern the rights and powers a judicial lien or judgment creditor would have had against it on the day it filed for bankruptcy, and the rights and powers a hypothetical bona fide purchaser of real property from it would have had on that same day. For the most part, none of those rights and powers were litigated in the state court suit between the Debtor and Village.

To the extent, however, that the Debtor's own obligations to Village under the various transactions involved in the state court suit were determined in that suit, creditors of or purchasers from the Debtor would be bound by the state court's rulings. Most of the rights such creditors or purchasers could assert against Village would derive directly from the Debtor, and the Bankruptcy Code does not give them any additional right to assert claims the Debtor could properly assert in the state court suit. For example, the state court's determination that the Lot 4 sale agreement obliged the Debtor to build the infrastructure required for Village to be able to build on Lot 4 precludes the Debtor from arguing now on behalf of its creditors and purchasers, as it did in state court on its own behalf, that the agreement did not impose such an obligation on the Debtor. Similarly, the

---

[30]*Regency Park v. City of Topeka*, 267 Kan. 465, 478 (1999).

Debtor cannot properly argue in this proceeding that the infrastructure for the Mission Corner development included the underground parking garages that were included in some of the development plans.[31]  In other words, with respect to the obligations the state court determined the Debtor had to develop Mission Corner, the Debtor's creditors or purchasers are in privity with the Debtor so that the state court's rulings preclude them from disputing the obligations that court found the Debtor's transactions with Village imposed on it.  The Debtor has not suggested anything in federal law would except these findings from the Full Faith and Credit Statute, and the Court is not aware of any applicable exception.

On the other hand, while Village argues appraisals and other evidence of the value of Mission Corner and Lot 4 were presented to the state court, Village does not identify any findings the court made about those values, or any claim for relief the Debtor asserted or could have asserted in the state court case that raised the question whether it received reasonably equivalent value in return for Lot 4.  Under Kansas law, the sufficiency of the consideration required for a contract to be enforceable between the parties who make it is largely up to them.  Some years ago, in *In re Estate of Shirk*, the Kansas Supreme Court determined the consideration a daughter gave was sufficient to make an enforceable contract for her mother to give her one-third of the mother's estate upon death, saying:

> Generally speaking, consideration is not insufficient merely because it is

---

[31]In paragraph 29 of its first amended complaint in this proceeding, the Debtor alleged the inclusion of the underground parking garages showed the Final Site Development Plan, the Final Plat, and the Declaration of Covenants and Restrictions were infeasible and uneconomic.  Dkt. no. 9, at 6.

inadequate.  To be sufficient, the consideration agreed upon must be a legal benefit or detriment, and need not be a thing of pecuniary value or reducible to such value . . . .  Nor does the legal sufficiency of a consideration for a promise depend upon the comparative economic value of the consideration and of what is promised in return, for the parties are deemed to be the best judges of the bargains entered into. The value of all things contracted for is measured by the appetite of the contractor . . . .  Where a party contracts for the performance of an act which will afford him pleasure, gratify his ambition, please his fancy, or express his appreciation of a service another has rendered him, his estimate of value must be left undisturbed, unless there is evidence of fraud . . . .  In the class of cases mentioned, if there is any legal consideration for a promise, it is sufficient.  If this were not the case, the result would be that the courts would be substituting their own judgment for the promisor's, and in so doing, make a new contract for the parties.[32]

So long as contracting parties each gave some consideration, the relative equivalence of the value of the exchanges they bargained for is not relevant to the enforceability of the contract in a lawsuit between them.  The $600,000 Village gave the Debtor for Lot 4 was certainly sufficient to make the sale contract enforceable against the Debtor.  The degree of equivalence of the consideration becomes relevant only when creditors of one of the parties (or their representative, such as the debtor-in-possession in a bankruptcy case) claim the contract amounted to a fraudulent transfer that the creditors can avoid under state law, the Bankruptcy Code, or a combination of the two.  Village has not shown that the state court's judgment precludes the Debtor from claiming it received less than reasonably equivalent value in its transactions with Village.

---

[32]*In re Shirk's Estate*, 186 Kan. 311, 321-22 (1960) (citations omitted); *see also Barfield v. Commerce Bank*, 484 F.3d 1276, 1278-79 (10th Cir. 2007) (Tenth Circuit relied on and quoted from *Shirk* in deciding that person's proposal to exchange large-denomination bill for smaller-denomination bills at bank constituted contract offer under Kansas law that was covered by federal statute barring racial discrimination that impairs right to make contracts).

24

**Conclusion**

For these reasons, the Court concludes Village's motion for summary judgment

must be denied.

# # #