

**SO ORDERED.**

**SIGNED this 06 day of April, 2011.**

*Dale L. Somers*

Dale L. Somers
**UNITED STATES BANKRUPTCY JUDGE**

_____

**Opinion Designated for Electronic Use, But Not for Print Publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

In Re:

**TERRA BENTLEY II, LLC,**

            **DEBTOR.**

**CASE NO. 09-23107-11**
**CHAPTER 11**

**TERRA BENTLEY II, LLC,**

            **PLAINTIFF,**

v.

**ADV. NO. 09-6099**

**VILLAGE OF OVERLAND POINTE,**
**LLC,**

            **DEFENDANT.**

**OPINION DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

This proceeding is before the Court on the Plaintiff's motion for summary

judgment. The Plaintiff appears by counsel James F.B. Daniels of McDowell Rice Smith & Buchanan. The Defendant appears by counsel Ronald S. Weiss of Berman DeLeve Kuchan & Chapman, L.C., and Steven R. Smith of Gates, Shields & Ferguson, P.A. The Court has reviewed the relevant materials and is now ready to rule.

In this adversary proceeding, Debtor Terra Bentley II, LLC, seeks to avoid certain transfers and other actions that affected its rights in a real estate development it was involved in with Defendant Village of Overland Pointe, LLC ("Village"). The Debtor now seeks summary judgment on all its claims, contending the Debtor's adoption and the local government's approval of a development plan and plat for the property, the sale of one lot in the development to Village, and the recording of a declaration of covenants and restrictions were all fraudulent transfers that it can avoid under Kansas state law and the Bankruptcy Code. Village responds that the Debtor's claims all fail, or at least that there are genuine issues of material fact that preclude resolving the claims by summary judgment. After considering the materials presented, the Court concludes that the Debtor's effort to avoid the adoption of the development plan and plat is barred as a matter of law by a state court judgment entered before the Debtor filed for bankruptcy, and that Village is correct that genuine issues of material fact preclude granting summary judgment on the Debtor's effort to avoid the sale of the lot and the recording of the declarations.

**Facts**

**A.      Background**

2

Terra-Bentley II, LLC, is the Debtor in the Chapter 11 bankruptcy case to which this adversary proceeding is related. Defendant Village is owned or controlled by two men, L. Gray Turner and John Sweeney, who were involved in organizing the Debtor and were its original managers.

In March 2005, Bentley Investments of Nevada IV, LLC ("Bentley IV"), and Terra Venture Investments, LLC ("Terra Venture"), formed the Debtor, dividing its ownership equally between them. At the time, Terra Venture had a contract to buy approximately 20 acres of land at the southeast corner of 135th Street and Mission Road in Leawood, Kansas, for almost $5 million. Under the Debtor's Operating Agreement,[1] Terra Venture assigned that contract to the Debtor. Bentley IV supplied enough cash to enable the Debtor to obtain a loan to buy the 20 acres. The Debtor took out a loan, bought the property, and named it "Mission Corner," mortgaging it as security for the loan.

The Operating Agreement also provided for an affiliate of Terra Venture that was a licensed real estate broker ("the Broker") to act as the listing agent who would try to sell either all or parts of Mission Corner for the Debtor. The listing agreement[2] was to last three years. The Operating Agreement specified an asking price for retail lots of $15 per square foot, and for office lots of $12 per square foot. A bulk selling price of $9.50 per square foot was specified for any sale of at least 8 acres. The Broker was to market the property for the asking prices, but was authorized to sell property for as little as 80% of

[1]Docket No. 46, ex. 2, pp. 1-41.

[2]Docket No. 46, ex. 2, pp. 40-41 (Schedule F to Operating Agreement).

3

those prices without the consent of the Debtor's members. The asking and bulk selling prices were gross prices from which commissions and closing costs were to be deducted, and if infrastructure improvements were required to sell the land, the Debtor's members had to approve any sale where the sale price minus the infrastructure cost was less than 80% of the asking price. The asking prices and the bulk selling price were to increase by $1 per square foot in the second year of the listing agreement, and another $1 in the third year. Another affiliate of Terra Venture was authorized to purchase lots at any time for 80% of the asking prices, but if no sales occurred in the first six months, could acquire lots for 70% of the asking prices.

As indicated, Turner and Sweeney were the Debtor's initial managers. They had a development plan and a plat prepared for Mission Corner. In January 2006, the Debtor submitted an application for rezoning and approval of a preliminary site plan and preliminary plat for Mission Corner, and the City of Leawood ("the City") approved the application by an ordinance passed in May 2006. The ordinance required the Debtor to make specified road and utility improvements before any building in the Mission Corner development could be finally occupied.

No part of Mission Corner was sold during the first year of the listing agreement. During the second year, in June 2006, the Debtor sold a retail lot designated as "Lot 4" in the preliminary plat to Village for $10.50 per square foot, or a total price of $607,908. Sweeney was the only person who signed the sale contract ("Lot 4 Sale Agreement"), and

he was identified as "Trustee, Member" for both the Debtor and Village.[3]  The Broker

was paid a commission of about $36,000 from the proceeds of the sale, and about

$567,000 was paid on the Debtor's mortgage loan.  The Debtor has conceded this

transaction was approved by Bentley IV and Terra Venture, as required by the Debtor's

Operating Agreement, because the $10.50 per square foot price was only 70% of the

original $15 per square foot asking price for retail space, not of the $16 per square foot

price in effect in the second year of the agreement.  Lot 4 contains 57,896 square feet and

is surrounded by the rest of the Debtor's Mission Corner property, which contains

641,804 square feet.  Lot 4 is therefore approximately 8.27% of the total property.  Utility

easements and internal roadways to serve Lot 4 would lay on or across the Debtor's

property.  In prior litigation between the Debtor and Village, a Kansas state court ruled

the parties intended for the Lot 4 Sale Agreement to require the Debtor to proceed with

construction of infrastructure for the Mission Corner development, and to complete and

file the final plat for the development.  The state court explicitly rejected the Debtor's

argument that the Lot 4 Sale Agreement should be construed to mean the parties intended

that the Mission Corner property might never be developed.

In August 2006, the Debtor applied for final approval of a site development plan

("the Plan") and a final plat ("the Plat") for Mission Corner, and the City approved it in

---

[3]In the Debtor's Operating Agreement, Sweeney is identified, along with Turner, as an initial
manager of the Debtor, not as a member, nor is he identified as a trustee of any sort.  But the parties have
ignored these discrepancies, and the Debtor concedes the sale complied with the Operating Agreement.
Consequently, the discrepancies have played no part in the Court's decision.

December 2006.  Like the ordinance approving the preliminary application, the resolutions approving the final Plan and Plat required the Debtor to make specified road and utility improvements before any building there could be finally occupied.

The City actually approved two resolutions concerning the Plan and Plat, and the materials presented by the parties do not make clear exactly what provisions the City approved.  According to a document the Debtor submitted that purports to be the minutes of a city council meeting held on December 18, 2006,[4] both Resolution 2716[5] and Resolution 2717 were considered and approved at the meeting.  The Resolutions are both labeled, "A Resolution Approving a Final Site Plan and Final Plat for Mission Corner, Located on the Southeast Corner of 135th Street and Mission Road, Leawood, Johnson County, Kansas."  Each Resolution contains numbered "stipulations of approval" recommended by the City's Planning Commission.  On Resolution 2716, Provision 38 reads:

> This preliminary plan approval shall lapse in *two years*, if construction on the project has not begun or if such construction is not being diligently pursued; provided, however, that the developer may request a hearing before the City Council to request an extension of this time period.  The City Council may grant such an extension for a definite period of time for good cause shown by the developer.  (Emphasis added.)

_____

[4]The Debtor's attorney signed an affidavit swearing that he downloaded this copy of the minutes over the Internet from the City's web site.  The Court questions whether this provides an adequate foundation to make the document admissible as evidence at trial, but will assume for purposes of the Debtor's motion that the document is a true and accurate copy of the minutes.

[5]Although the copy of Resolution 2716 attached to the Debtor's reply brief is certified, part of it is clearly missing.  The third page of the document ends with Provision 17, which appears to be complete, and the fourth page begins with a carry-over Provision and the first full Provision on the page is Provision 38.  So Provisions 18 through part of Provision 37 are missing from the copy provided.

6

On Resolution 2717, Provision 41 reads:

> This final plan approval shall lapse in *five years*, if construction on the project has not begun or if such construction is not being diligently pursued; provided, however, that the developer may request a hearing before the City Council to request an extension of this time period. The City Council may grant such an extension for a definite period of time for good cause shown by the developer. (Emphasis added.)

The Debtor relies on the two-year lapse period stated in Resolution 2716, while Village relies on the five-year lapse period stated in Resolution 2717.

In the minutes of the City Council meeting on December 18, 2006, Resolution 2716 is referred to as "Item 12A" and Resolution 2717 at "Item 12B." Under Item 12A, the minutes include a sentence the Debtor relies on that says, "The provisions of Item No. 12A will supersede those of Item No. 12B." However, under Item 12B, they include a sentence that says, "Except for the final plat, the provisions stated in Item No. 12A will supersede those of 12B." No copy of the final plat is attached to either Resolution, and the materials presented do not otherwise suggest what this exception means. The Debtor contends the notations about the provisions of Item 12A superseding those of Item 12B mean the two-year term of the preliminary plan approval in Resolution 2716 controlled, and the approval of its Plan and Plat expired two years after December 18, 2006.

Earlier in 2006, the Debtor had obtained an estimate of the cost, based on preliminary plans, to build the infrastructure for the Mission Corner development. The estimate was almost $2.5 million, but that was later reduced to just under $2 million because fill dirt was available from another site, and a retaining wall and water feature

7

were eliminated. The Debtor hired a construction company to do some grading and other infrastructure work, and that company obtained a grading permit late in December 2006. According to materials the Debtor submitted in support of a motion it filed in an adversary proceeding in which Village sued the Debtor and others, Adversary No. 10-6025, the Debtor borrowed $850,000 to pay for construction work that was done on Mission Corner.

In May 2007, a significant change in the Debtor's operations occurred. Paragraph 9.7 of the Debtor's Operating Agreement established a reciprocal buy-sell option for Bentley IV and Terra Venture. Under it, Bentley IV could force Terra Venture to choose either to buy Bentley IV's half of the Debtor or sell its own half to Bentley IV, and Terra Venture could do the same to Bentley IV. On May 29, 2007, Bentley IV served Terra Venture with a letter exercising this option. Terra Venture had sixty days to choose whether to buy or to sell.

On June 6, 2007, acting as the Debtor's manager, Sweeney executed five contracts purporting to sell other Mission Corner lots to Village. In later litigation, the state court ruled these contracts were invalid because they were not approved by Bentley IV, as required under the Debtor's Operating Agreement.

On July 23, 2007, shortly before Terra Venture's decision about the buy-or-sell demand was due, the Debtor and Village signed a document called the "Mission Corner Declaration of Covenants, Restrictions, Easements, Reservations and Assessments" ("the Declarations") which was filed two days later with the Johnson County Register of

Deeds. Turner signed this document as a manager of the Debtor, and Sweeney signed it as a member of Village. The Declarations say when the "Developer" (who is the Debtor) sells a lot to a third party, the Developer will begin and diligently proceed with all infrastructure improvements required for a certificate of occupancy to be issued for a building to be built on the lot. The lot's buyer is to reimburse the Developer for a pro rata share of the costs of all public and private infrastructure and other common improvements incurred in developing Mission Corner.

On July 27, 2007, Terra Venture chose to sell its interest in the Debtor to Bentley IV. The Operating Agreement called for the closing on this transaction to occur within 30 days, and on August 14, Bentley IV became the sole owner of the Debtor.

In the summer of 2007, representatives of Bentley IV told the construction company that was working on the Mission Corner infrastructure that they had taken over as managers of Mission Corner, and the company would no longer be dealing with Turner or Sweeney. Later, they told the company to stop the infrastructure work on the development. At that time, the rough grading and erosion control had been completed and some temporary fencing had been installed. After that, the Debtor refused to take any further action to get the Plat filed or to install any infrastructure.

At the end of August 2007, the Debtor and two related companies sued Village and other parties in a Kansas state court. Mission Corner was one of the main subjects of the suit and it was described as "approximately 20.19 acres of land located in the vicinity of

9

the southeast corner of 135th and Mission Road in Leawood, Johnson County, KS."[6] The Debtor alleged breach of fiduciary duties, fraud, and tortious breach of contract, and sought rescission or cancellation of the five contracts to sell lots to Village that Bentley IV had not approved. One of the Debtor's main legal theories was that managers Turner and Sweeney had violated their fiduciary obligations to the Debtor and its members by failing to comply with: (1) provisions in its Operating Agreement that called for any infrastructure at Mission Corner to be funded solely from the proceeds of sales of lots in the development, and (2) a later decision Bentley IV and Terra Venture had made not to engage in physical development of Mission Corner until either they sold all of Mission Corner to an experienced developer or found another owner to replace Bentley IV. The Debtor did not seek to rescind the Lot 4 Sale Agreement. Village filed its answer in September 2007, and asserted a counterclaim asking that the Debtor be required to finish platting Mission Corner, and finish the grading, roads, and utilities for the development. In July 2008, the state court issued its decision voiding the five sale contracts. Then on January 7, 2009, following a bench trial, it issued an opinion deciding the remaining claims between the parties. The Debtor now contends the City Resolutions approving the Plan and Plat had already lapsed by the time this final opinion was issued.

Early in the January 2009 opinion, the state court noted it had previously ruled that the Lot 4 Sale Agreement showed, as a matter of law, that the Debtor and Village

---

[6]Docket no. 41, ex. 33 at 3-4.

intended for the Plat to be completed and filed, and for infrastructure to be built, and that the agreement obligated the Debtor to pursue those activities. The court said it had also determined the Debtor would have a reasonable time to complete the platting and build the infrastructure, but evidence would have to be presented for the court to be able to determine what a reasonable time for performance under the agreement was. If the court found the Debtor had failed to do the platting and build the infrastructure within a reasonable time, the court would have to determine the appropriate remedy.

The state court decided that a reasonable time for the Debtor to file the Plat for Mission Corner was no later than October 31, 2007, and that Village probably would have obtained a building permit for Lot 4 by that date but for the Debtor's actions. The court concluded that a reasonable time to complete the infrastructure was no later than December 31, 2007, and that Village would have completed its building on Lot 4 by approximately July 30, 2008, if the Debtor had built the necessary infrastructure.

The state court found the Debtor was obliged by the Lot 4 Sale Agreement to file the Mission Corner Plat and build the infrastructure for the development. The court granted Village's request for specific performance under the agreement, and ordered the Debtor: (1) to sign and file the final Plat of Mission Corner; (2) to comply with the City's ordinance approving the Debtor's preliminary plan and plat, including getting off-site road and utility improvements completed; (3) to comply with the City's ordinance approving the final Plan and Plat (this is referred to as "Ordinance 2716" in the court's opinion, and as "Resolution 2716" in the copy of the document presented to this Court,

11

which was certified by the City Clerk), including getting off-site road and utility improvements completed; (4) to complete all on-site infrastructure, including internal streets and all utilities; (5) to do everything specified in a letter from the City to be necessary for Village to obtain a building permit; and (6) to pay all governmental or other fees and costs required of the developer for Village to obtain a building permit. The court awarded Village $1.362 million as damages for the Debtor's delay in completing the infrastructure. Finally, the court declared that the Debtor's managers had the authority to execute the Declarations, so they were binding on both the Debtor and Village.

The Debtor appealed the state court's decision. The parties have presented no information about the status of that appeal.

The Debtor filed a Chapter 11 bankruptcy petition on September 18, 2009, eight months after the state trial court's final decision. A few days later, the Debtor filed this adversary proceeding against Village. It filed an amended complaint on October 30, 2009. In Count I of the amended complaint, the Debtor claims that under § 544(a)(3) of the Bankruptcy Code, it can avoid the Plan and Plat for Mission Corner because a hypothetical bona fide purchaser who bought that real property on the day the Debtor filed for bankruptcy would not be subject to either the Plan or the Plat because they had not been recorded with the county register of deeds, as required by K.S.A. 58-2221 and 58-2223. In Count II, the Debtor claims that under § 544(a)(1) and (a)(2), it can avoid the Lot 4 Sale Agreement and the Declarations because a judicial lien creditor or creditor who obtained an execution that was returned unsatisfied on the day the Debtor filed for

12

bankruptcy could avoid them as fraudulent transfers under K.S.A. 33-204(a)(1) and (a)(2) and K.S.A. 33-205(a).

In March 2010, Village filed a motion for summary judgment, arguing the state court's rulings barred both counts of the Debtor's complaint. In November 2010, this Court issued its opinion denying the motion. The Court concluded neither claim preclusion nor issue preclusion barred the Debtor's claims on the grounds then asserted by Village. However, the Court also ruled that the Debtor was bound by certain aspects of the state court's decision, saying:

> To the extent, however, that the Debtor's own obligations to Village under the various transactions involved in the state court suit were determined in that suit, creditors of or purchasers from the Debtor would be bound by the state court's rulings. Most of the rights such creditors or purchasers could assert against Village would derive directly from the Debtor, and the Bankruptcy Code does not give them any additional right to assert claims the Debtor could properly assert in the state court suit. For example, the state court's determination that the Lot 4 sale agreement obliged the Debtor to build the infrastructure required for Village to be able to build on Lot 4 precludes the Debtor from arguing now on behalf of its creditors and purchasers, as it did in state court on its own behalf, that the agreement did not impose such an obligation on the Debtor. Similarly, the Debtor cannot properly argue in this proceeding that the infrastructure for the Mission Corner development included the underground parking garages that were included in some of the development plans.[7] In other words, with respect to the obligations the state court determined the Debtor had to develop Mission Corner, the Debtor's creditors or purchasers are in privity with the Debtor so that the state court's rulings preclude them from disputing the obligations that court found the Debtor's transactions with Village imposed on it. The Debtor has not suggested anything in federal

---

[7]In paragraph 29 of its first amended complaint in this proceeding, the Debtor alleged the inclusion of certain underground parking garages showed the final site development plan, the final plat, and the Declarations were infeasible and uneconomic. Docket no. 9, at 6. In its current motion, the Debtor presses no argument about the underground parking garages.

law would except these findings from the Full Faith and Credit Statute, and the Court is not aware of any applicable exception.

**B.     Unsupported allegation about the City's position in this proceeding.**

In the first full paragraph on page 2 of its reply brief, the Debtor alleges that the City has "expressed informally" its position concerning certain aspects of the Debtor's dispute with Village, and argues the City's position supports the Debtor's argument that the Mission Corner Plan and Plat expired and cannot form the basis for any development of the property. The Debtor has submitted no evidence to show that the City's position is as alleged. This is clearly improper and the Court has ignored this allegation in deciding how to rule on the Debtor's motion.

**The Debtor's motion for summary judgment**

The Debtor filed its motion for summary judgment in November 2010. Village moved to strike the motion, saying it had been filed after an agreed deadline for dispositive motions had expired. At a hearing in December, the Court denied the motion to strike and gave Village time to respond to the substance of the motion. Village filed its response and the Debtor filed a reply.

In its motion, the Debtor argued it could avoid the Mission Corner Plan and Plat because they had not been recorded and so, under K.S.A. 58-2221 and 58-2223,[8] would not be binding on a hypothetical bona fide purchaser of the real property as of the day the

---

[8]The Debtor actually cited the statutes as K.S.A. 58-221 and 58-223, but those provisions concern liens on personal property. K.S.A. 58-2221 and 58-2223 concern the recording of instruments that affecting real estate and the effect of recording or not recording them. Village recognized that the Debtor's argument was based on K.S.A. 58-2221 and 58-2223, and not those other statutes.

14

Debtor filed its bankruptcy petition. The Debtor also argued the Plan and Plat had

expired because no development had been commenced within two years after the City

approved the Resolutions adopting the Plan and Plat, as the Resolutions required. The

Debtor further argued that it could, under the Kansas Uniform Fraudulent Transfer Act,

K.S.A. 33-201, *et seq.*, avoid the sale of Lot 4 to Village and the execution and recording

of the Declarations as transfers made either with the intent to hinder, delay, or defraud its

creditors, or for a less than reasonably equivalent value while the Debtor was insolvent.

The Debtor also pressed certain other arguments that were resolved by the Court's

subsequent opinion denying Village's motion for summary judgment.

Village filed its response in January 2011. It contended the City's approval of the

Debtor's Plan and Plat would not lapse for five years, rather than the two years claimed

by the Debtor. It argued the Plat was recorded as an attachment to the Declarations,

which therefore, under K.S.A. 58-2222, imparted notice of the Plat to any subsequent

purchaser of Mission Corner. It also contended the Plan was not required to be recorded

with the register of deeds, but part of it nevertheless was also recorded as an attachment

to the Declarations. Village added that the state court's judgment also constituted public

notice of the Mission Corner Plan and Plat, and suggested the City's Resolutions

constituted public records giving notice of the Plan and Plat as well. Village said these

filings all meant a purchaser of the Debtor's interest in Mission Corner as of the day the

Debtor filed for bankruptcy would have had notice of the Plan and Plat, or at least that

Village had raised a question of fact sufficient to preclude summary judgment in the

15

Debtor's favor on that point. Village argued that the Debtor had produced no evidence and not even alleged that the transfers were made with the actual intent to hinder, delay, or defraud creditors, and that the reasonable equivalence of the price it paid the Debtor for Lot 4 was a fact question that could not be resolved by summary judgment. Village also claimed the Debtor's solvency when each transfer was made was a question of fact that must be determined at trial.

The Debtor filed a lengthy reply. The Debtor pointed out that neither the City nor Johnson County responded to its motion, and argued the Plan and Plat should therefore be avoided as to them. The Debtor argued Resolution 2716 required the Debtor to pay a fee of $311 per linear foot of frontage along Mission Road, estimated to be $206,152.57, before recording the final Plat, and no evidence showed that fee had been paid, so any recording of the Plat as part of the Declarations was a nullity. The Debtor also argued that K.S.A. 12-752 required the Plat to be endorsed by the City before the register of deeds could properly file it. Relying on the minutes of the December 18, 2006, meeting of the City Council that the Debtor obtained from the City's web site, the Debtor again argued the City had adopted a two-year lapse period for the Debtor's Plan and Plat, not the five-year period claimed by Village. This two-year period, the Debtor argued, had passed with no construction being commenced on Mission Corner, so the Plan and Plat had lapsed and were avoidable for that reason as well. The Debtor argued that with respect to the Declarations, several of the circumstances identified in K.S.A. 33-204(b), commonly known as "badges of fraud," existed and established the filing of the

16

Declarations had been done with the intent to hinder, delay, or defraud the Debtor's creditors. The Debtor further suggested the sale of Lot 4 was clearly made for a less than reasonably equivalent value because, as the state court found, the sale contract imposed an obligation on the Debtor to build $1.9 million in infrastructure, about $1.3 million more than the Debtor received for the lot. The transfer therefore, the Debtor added, rendered the Debtor insolvent. The Debtor also contended Turner and Sweeney either knew or should have known the sale left the Debtor with debts beyond its ability to pay as they became due.

**Discussion**

**1.      Summary judgment standards**

Under the applicable rules of procedure, the Court is to grant summary judgment if the moving party demonstrates that there is "no genuine issue of material fact" and that the party "is entitled to a judgment as a matter of law."[9] The substantive law identifies which facts are material.[10] A dispute over a material fact is genuine when the evidence is such that a reasonable factfinder could resolve the dispute in favor of the party opposing the motion.[11] In adjudicating disputes, bankruptcy courts usually both determine the law and find the facts. In deciding a summary judgment motion, though, the Court is limited to its role of deciding legal questions, not weighing the evidence and resolving factual

---

[9]Fed. R. Civil P. 56(c), made applicable by Fed. R. Bankr. P. 7056.

[10]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[11]*Id.*

17

disputes, but merely determining whether the evidence favorable to the non-moving party about a material fact is sufficient to require a trial[12] at which the Court would act in its factfinding role. Summary judgment is inappropriate if an inference can be drawn from the materials properly submitted either to support or oppose the motion that would allow the non-moving party to prevail at trial.[13]

The substantive law's allocation of the burden of proof also affects the Court's analysis of a summary judgment motion. The party asking for summary judgment has the initial burden of showing that no genuine issue of material fact exists.[14] But if the moving party does not have the burden of proof on a question, this showing requires only pointing out to the Court that the other party does not have sufficient evidence to support a finding in that party's favor on that question.[15] When such a showing is made, the party with the burden of proof must respond with affidavits, depositions, answers to interrogatories, or admissions sufficient to establish that a finding on the question could properly be made in the party's favor at trial.[16]

As a general rule, questions involving a person's intent or other state of mind

_____

[12]*Id.* at 249-50.

[13]*See id.* at 248.

[14]*Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1036 (10th Cir. 1993).

[15]*Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

[16]*Celotex,* 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

Case 09-06099    Doc# 74    Filed 04/06/11    Page 18 of 31

cannot be resolved by summary judgment.[17]  But in an exceptional case, a person's "denial of knowledge may be so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe it," making a trial on the question of the person's state of mind unnecessary.[18]

## 2.    The Debtor's claim to avoid the Plan and Plat for Mission Corner.

The Debtor's first claim is that, under Kansas law, a bona fide purchaser of Mission Corner would take the property free of the Plan and the Plat because they are documents affecting real estate that were not recorded with the county register of deeds pursuant to K.S.A. 58-2221.  K.S.A. 58-2221 provides in part:  "Every instrument in writing that conveys:  . . . or (d) whereby any real estate may be affected . . . may be recorded in the office of the register of deeds of the county in which such real estate is situated."  K.S.A. 58-2222 and 58-2223 then specify the effects of filing or failing to file an instrument affecting real estate.  K.S.A. 58-2222 provides:  "Every such instrument in writing . . . shall, from the time of filing . . . impart notice to all persons of the contents thereof; and all subsequent purchasers and mortgagees shall be deemed to purchase with notice."  K.S.A. 58-2223 provides:  "No such instrument in writing shall be valid, except between the parties thereto, and such as have actual notice thereof, until the same shall be

---

[17]*Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980), *cert. denied* 451 U.S. 984 (1981); *see also* 10B Wright, Miller & Kane, *Fed. Prac. & Pro. Civil 3d*, §2730 (1998) (indicating actions involving state of mind can rarely be determined by summary judgment, except when the opposing party does not present sufficient circumstantial evidence to support a potential finding contrary to the person's professed state of mind).

[18]*In re Chavin*, 150 F.3d 726, 728-29 (7th Cir. 1998).

19

deposited with the register of deeds for record." If these statutes apply to the Plan and the

Plat, a subsequent purchaser from the Debtor would not be bound by them unless

something else gave the purchaser effective notice of them.[19]

Section 544(a)(3) of the Bankruptcy Code provides:

(a)    The trustee shall have, as of the comencement of the case, and
       without regard to any knowledge of the trustee or of any creditor, the
       rights and powers of, or may avoid any transfer of property of the
       debtor or any obligation incurred by the debtor that is voidable by —
       . . .
       (3)    a bona fide purchaser of real property, other than
              fixtures, from the debtor, against whom applicable
              law permits such transfer to be perfected, that obtains the
              status of a bona fide purchaser and has perfected such
              transfer at the time of the commencement of the case,
              whether or not such a purchaser exists.

So if the Plan and the Plat had to be filed under K.S.A. 58-2221, 58-2222, and 58-2223,

the Debtor could, under § 544(a)(3), avoid the obligations they imposed on it, unless

something else would have given a potential buyer of Mission Corner effective notice of

those documents.

The Court will first reject the Debtor's argument that the Plan and the Plat should

be avoided with respect to the City and the County because they failed to respond to the

Debtor's motion. Village is defending the continued enforceability of the Plan and the

Plat. Declaring the Plan and the Plat avoided as to some of the parties while leaving them

---

[19]*See, e.g., Jeremiah 29:11, Inc., v. Seifert*, 284 Kan. 468, 472-75 (2007) (under K.S.A. 58-2223, restrictive covenant in recorded deed not signed by grantees was not binding on subsequent purchasers; signatures required to give notice grantees accepted covenant); *Shlup v. Bourden*, 33 Kan. App. 2d 564, 567-71 (2005) (under K.S.A. 58-2223, covenant to provide free natural gas not binding on subsequent purchaser because deed with covenant not recorded until after purchase).

potentially in effect as to others would simply add unnecessary confusion to this litigation.

The Court next concludes the state court judgment was sufficient to give any potential buyer notice of the Plan and the Plat as of the day the Debtor filed for bankruptcy. Under Kansas law, when the Debtor filed the state court lawsuit, clearly identifying Mission Corner as real property involved in the suit, and Village filed its answer and counterclaim a few weeks later, the pendency of the suit prevented any third party from acquiring an interest in Mission Corner that would be superior to either the Debtor's or Village's interests in the property as claimed in the petition and counterclaim. As relevant here, K.S.A. 60-2201 provides: "When a petition has been filed in the district court pursuant to chapter 60 of the Kansas Statutes Annotated, the action is pending so as to charge third persons with notice of its pendency, and while pending no interest can be acquired by third persons in the subject matter thereof as against the plaintiff's claim." With only minor revisions, this *lis pendens* statute has been in effect in Kansas for more than one hundred years.[20] The Kansas Supreme Court has declared that the statute adopted the longstanding equitable doctrine of *lis pendens*, and quoted with approval this definition, "'A purchase made of property actually in litigation, *pendente lite*, for a valuable consideration, and without any express or implied notice in point of fact, affects the purchaser in the same manner as if he had such notice; and he will accordingly be

---

[20]*See, e.g., Smith v. Kimball*, 36 Kan. 474, 483 (1887) (quoting predecessor version of K.S.A. 60-2201, then designated as § 81 of the Code of Civil Procedure).

bound by the judgment or decree in the suit.'"[21]  The court noted that before the statute was enacted, the doctrine had not been based on any presumption of notice but on public policy, while the statute did use a constructive notice phrase ("so as to charge third persons with notice of its pendency").[22]  Nevertheless, the court concluded the statute was intended to adopt the "best exposition of the rule that binds a third person who intermeddles with the subject-matter of a suit pending."[23]

Kansas case law has tempered the literal language of the *lis pendens* statute by construing it to require three things before the constructive notice it mandates will arise: "(1) The property must be of a character to be subject to the rule of *lis pendens*; (2) the court must acquire jurisdiction of both the person and the property; and (3) the property must be sufficiently described in the pleadings."[24]  Case law has made clear that real property is subject to the *lis pendens* statute.[25]  The state court undoubtedly acquired jurisdiction over the Debtor, Village, and the Mission Corner property in their lawsuit before that court.  The Debtor's description of the property in its complaint —

---

[21]*Smith v. Kimball*, 36 Kan. at 485 (quoting definition stated by Justice Story in 1 *Equity Jurisprudence*, § 405).

[22]*Id*. at 484.

[23]*Id*.

[24]*Herman v. Goetz*, 204 Kan. 91, 97 (1969); *see also Cousatte v. Collins*, 31 Kan. app. 2d 157, 160 (2003) (quoting three requirements stated in *Herman v. Goetz* and relying on it to find no constructive notice existed because property not sufficiently described in pleadings).

[25]*See, e.g., Graham v. Pepple*, 129 Kan. 735, 737 (1930) (divorce petition asking for 53.5 acres in specified county as alimony sufficient for *lis pendens*).

22

"approximately 20.19 acres of land located in the vicinity of the southeast corner of 135th and Mission Road in Leawood, Johnson County, KS" — was certainly sufficient to make the statute apply. While the suit was pending, then, no third party could have obtained Mission Corner (or any part of it) from the Debtor without being potentially subject to the Plan and the Plat that Village was asking the court to order the Debtor to record and comply with.

Kansas cases make clear that the preliminary *lis pendens* effect of a lawsuit becomes final when a judgment is entered in the suit. For example, in *Harrod v. Burke*, the Kansas Supreme Court said, "The rule in equity is that a pending suit, duly prosecuted and not collusive, is notice to a purchaser of the property in dispute from a party to the litigation, so as to affect and bind his interest by the decree. . . . The purpose of the rule is to prevent third persons during the pendency of the litigation from acquiring interests in the land which would preclude the court from granting the relief sought."[26] Thus, the preliminary *lis pendens* effect of the lawsuit between the Debtor and Village was later finalized when the state court entered its judgment in Village's favor with respect to the Plan and Plat. That judgment had been rendered and was in effect when the Debtor filed for bankruptcy, so its rulings gave effective notice to any potential buyer of Mission Corner that the Debtor's interests in the property were subject to the restrictions imposed by the judgment. Consequently, although Village has not moved for summary judgment,

---

[26]76 Kan. 909, 911 (1907).

the established facts make clear the Debtor's claim to avoid the Plan and the Plat under § 544(a)(3) of the Bankruptcy Code will fail.

3.      **The Debtor's claim the Plan and the Plat expired under the terms of Resolution 2716**.

For a number of reasons, the Court cannot accept the Debtor's argument that its Plan and Plat lapsed in December 2008, before the state court issued its judgment ordering the Debtor to record the Plat and proceed with construction of the infrastructure necessary to develop the Mission Corner property. First and foremost, this claim is one the Debtor needed to raise in the state court suit. The judgment directing the Debtor to record the Plat and build the infrastructure necessarily required the Debtor to continue to operate under those Resolutions, and the Debtor cannot newly argue before this Court that the Resolutions expired before the state court even rendered its judgment. Claim preclusion bars that claim.[27]

Even if the Debtor were not barred from making that claim now, the Court could not grant summary judgment on the claim. First, the minutes of the December 2006 City council meeting that the Debtor produced do not make clear the council's intention to impose a two-year time limit on the Debtor's Plan and Plat. Maybe the statements that the provisions of Resolution 2716 "will supersede" those of Resolution 2717 mean all the provisions of Resolution 2716 will override all the provisions of Resolution 2717,

---

[27]*See Winkel v. Miller*, 288 Kan. 455, 468 (2009); *In re Estate of Reed*, 236 Kan. 514, 519 (1985);

24

although that would seem to make the approval of Resolution 2717 meaningless. The statements might mean that the provisions of Resolution 2716 will control only where there are conflicts. Resolution 2716 says a two-year lapse period applies to the "preliminary plan approval" while Resolution 2717 says a five-year lapse period applies to the "final plan approval." These provisions are not necessarily conflicting, and the City might have intended for both periods to apply, one to the preliminary plan and the other to the final plan. In addition, at one of the places where the minutes say the provisions of Resolution 2716 "will supersede" those of Resolution 2717, they also say "except for the final plat." The Court is unable to determine what that exception means. Perhaps it includes the five-year lapse period stated in Resolution 2717. Second, the Debtor has not produced any admissible evidence to show that the City has declared or otherwise considers the Resolutions to have expired. The City might well be awaiting the outcome of the litigation between Village and the Debtor before deciding whether to allow the Mission Corner development to proceed or to declare that the Resolutions have lapsed. Third, both Resolutions say the Debtor could obtain an extension of their deadlines "for good cause." A court order to continue to perform under the Resolutions would likely constitute good cause to obtain an extension. Fourth, the Debtor itself contends it has paid $850,000 for some work that was performed on the Mission Corner property, and Resolution 2716 says it will lapse in two years only "if construction on the project has not begun or if such construction is not being diligently pursued." The Debtor's materials do not establish that construction "has not begun," although they do

25

suggest construction "is not being diligently pursued." The City might, however, consider the pursuit of the litigation between the parties to be a substitute for continued construction that has been sufficient to keep the Resolutions in effect. In short, the Debtor's materials do not establish for purposes of summary judgment that the Plan and the Plat lapsed, completely and irrevocably, in December 2008.

**4.      The Debtor's claims to avoid (a) the Lot 4 Sale Agreement and (b) the execution and recording of the Declarations.**

The Debtor claims that under the Kansas Uniform Fraudulent Transfer Act, K.S.A. 33-201 to -212, certain types of its creditors (whether creditors of those types actually existed or not) could avoid both the Lot 4 Sale Agreement and the Declarations as fraudulent transfers under K.S.A. 33-204(a)(1) and (a)(2) and 33-205(a). K.S.A. 33-204(a) provides:

> (a)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (1)    With actual intent to hinder, delay or defraud any creditor of the debtor; or
> (2)    without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> >     (A)    Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> >     (B)    intended to incur, or believed or reasonably should have believed that such debtor would incur, debts beyond such debtor's ability to pay as they became due.

26

K.S.A. 33-205(a) provides:

> (a)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

K.S.A. 33-207(a) provides that a creditor attacking a transfer or obligation may obtain

avoidance of the transfer or obligation to the extent necessary to satisfy its claim, and

K.S.A. 33-207(b) provides that if the creditor has a judgment against the debtor, the court

may allow the creditor to levy execution on the transferred asset or its proceeds.

Section 544(a)(1) and (a)(2) authorize a debtor-in-possession like the Debtor to

avoid transfers and obligations that certain creditors would be able to avoid under

applicable state law. They read:

> (a)    The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by —
>
> (1)    a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; [or]
>
> (2)    a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists.

So if the Debtor can show the Lot 4 Sale Agreement and the Declarations satisfied the

criteria of K.S.A. 33-204(a)(1) or (a)(2), or K.S.A. 33-205(a), it can avoid those transfers under § 544(a)(1) or (a)(2).

**(a)**     **The Lot 4 Sale Agreement**

The Debtor argues that for Lot 4 Sale Agreement, its evidence establishes the existence of two of the badges of fraud listed in K.S.A. 33-204(b), and therefore establishes that Turner and Sweeney, then acting as its managers, made the transfers with the actual intent to hinder, delay, or defraud the Debtor's creditors. The Debtor argues the transfer was made to insiders and was made for less than a reasonably equivalent value. The Court agrees the transfer was made to an insider since Turner and Sweeney were managers of the Debtor and were also managers of Village when the Debtor sold Lot 4 to Village. However, the Court cannot agree with the Debtor's argument about the value it received from the sale. Relying on the state court's judgment, the Debtor argues the Lot 4 Sale Agreement imposed an obligation on the Debtor to build infrastructure costing slightly more than $1.9 million, while Village paid only $607,908. This shows, the Debtor contends, that the sale caused it to suffer a net loss of $1.3 million. While it is true that the infrastructure construction would have benefitted Lot 4, all the other land in Mission Corner would most likely have benefitted from it as well, and the Debtor still owned that land after it sold Lot 4 to Village. Additional evidence must be presented before the Court can determine what portion of the infrastructure obligation should be attributed to Lot 4.

The Debtor has suggested the value Village claimed for Lot 4 in the state court

Case 09-06099    Doc# 74    Filed 04/06/11    Page 28 of 31

litigation, $1.2 million, is another measure showing the Lot 4 sale price was not a reasonably equivalent value. But the Debtor must show the value it received in June 2006 was not reasonably equivalent to Lot 4's value at that time. The lawsuit was not commenced until August 2007, more than a year after the sale. In addition, Village contends the $1.2 million value it pressed in the state court suit was the value Lot 4 would have had with all the Mission Corner infrastructure in place, not as the property existed in June 2006. The evidence is insufficient to allow the Court to determine what the value of Lot 4 was at the time of the transfer.

These considerations make clear the Debtor has not presented sufficient evidence to justify a summary judgment declaring that the Lot 4 Sale Agreement was made with the actual intent to hinder, delay, or defraud any of its creditors, or was made for a less than reasonably equivalent value.

**(b)    The execution and recording of the Declarations**

The Debtor also contends it has shown the execution and recording of the Declarations was a fraudulent transfer because several badges of fraud existed and the Debtor received nothing in return for the rights it gave up in that document. The main problem with this claim now is that, as found by the state court, the Lot 4 Sale Agreement had already obligated the Debtor to subject Mission Corner to the final Plan and final Plat and to build specified infrastructure, and the Debtor has not identified any additional value it gave up as a result of the execution and recording of the Declarations. The Debtor's evidence of an intent to hinder, delay, or defraud creditors is stronger on this

29

claim than for the Lot 4 Sale Agreement because Turner and Sweeney executed and recorded the Declarations during the sixty-day period when Terra Venture had to decide whether to buy Bentley IV's interest in the Debtor or sell its own interest to Bentley IV, and Turner and Sweeney also made five invalid transfers of the Debtor's interests in Mission Corner during that period. However, the materials presented do not establish for purposes of summary judgment that the Debtor gave up any value by executing and recording the Declarations.

Given these considerations, the Court concludes the Debtor has not presented sufficient evidence to justify a summary judgment declaring that the execution and recording of the Declarations constituted a transfer made with the actual intent to hinder, delay, or defraud any of its creditors, or was a transfer made for a less than reasonably equivalent value.

**5.     The Debtor's alleged insolvency**

The Debtor asks the Court to rule that it was insolvent as a matter of law when the Lot 4 Sale Agreement was made and when the Declarations were recorded because, although it owned the Mission Corner property, it had no cash, no income except from sales of Mission Corner lots that might occur, and no authority to require its members to make any additional capital contributions. However, the Debtor also claims that it came up with $850,000 to pay for work Turner and Sweeney contracted to have done on Mission Corner while they were the Debtor's managers. In light of the Debtor's limited evidence, the Court concludes this is enough to raise a genuine issue of material fact

30

about the Debtor's solvency at the time each of the transfers was made. The Court further notes that the Debtor cannot succeed on its claims through some generalized claim of insolvency at some unspecified time, but with respect to each transfer, must show that it was insolvent when that specific transfer was made.

**Conclusion**

For these reasons, the Court concludes the Debtor's claim to avoid the Mission Corner Plan and Plat is barred by the state court's judgment which, under Kansas law, gave effective notice of the Plan and Plat to any potential buyer of the Debtor's interest in the property. Furthermore, the Debtor has failed to establish, for purposes of summary judgment, either (1) the Lot 4 Sale Agreement was made with the actual intent to hinder, delay, or defraud any creditor, or was made for a less than reasonably equivalent value while the Debtor was insolvent; or (2) the execution and recording of the Declarations was made with the actual intent to hinder, delay, or defraud any creditor, or was made for a less than reasonably equivalent value while the Debtor was insolvent. The Debtor's summary judgment motion is therefore denied.

# # #

31