

**SO ORDERED.**

**SIGNED this 27th day of April, 2012.**

Dale L. Somers
United States Bankruptcy Judge

---

**Opinion Designated for Electronic Use, But Not for Print Publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In Re: | |
| **TERRA BENTLEY II, LLC,** | **CASE NO. 09-23107-11** |
| DEBTOR. | **CHAPTER 11** |
| **TERRA BENTLEY II, LLC,** | |
| PLAINTIFF, | |
| v. | **ADV. NO. 09-6099** |
| **VILLAGE OF OVERLAND POINTE, LLC,** | |
| DEFENDANT. | |

**OPINION CONCLUDING PLAINTIFF FAILED TO PROVE ITS CLAIMS**
**TO AVOID TWO TRANSFERS AS CONSTRUCTIVELY FRAUDULENT**
**UNDER THE KANSAS UNIFORM FRAUDULENT TRANSFER ACT**

This proceeding was before the Court for trial on January 24, 25, and 26. The

Plaintiff-Debtor appeared by counsel James F.B. Daniels. The Defendant appeared by

counsel Eldon Shields and Steve Smith.  The Court heard evidence and arguments, and announced its ruling on several of the Debtor's claims, but reserved ruling on its claims seeking to avoid the sale of land usually identified as Lot 4 and the filing of a Declaration of Covenants, Restrictions, Easements, Reservations and Assessments on the ground they constituted transfers made or obligations incurred without receiving a reasonably equivalent value in exchange when the Debtor either (1) was engaged in a business for which its remaining assets were unreasonably small in relation to the business, (2) intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay as they came due, or (3) was insolvent.  The Court is now ready to rule on those reserved questions.

**Background Facts**

Terra-Bentley II, LLC, is the Debtor in the Chapter 11 bankruptcy case to which this adversary proceeding is related.  Defendant Village of Overland Pointe, LLC ("Village") is owned or controlled by L. Gray Turner and John Sweeney, two men who were involved in organizing the Debtor and were its original managers.  Turner and Sweeney also owned or controlled Terra Venture Investments, LLC ("Terra Venture").

In March 2005, Bentley Investments of Nevada IV, LLC ("Bentley IV"), and Terra Venture formed the Debtor, dividing its ownership equally between them.  They signed an operating agreement ("Operating Agreement") that initially governed the Debtor and its business.  The Operating Agreement provided that it could not be amended except in a writing approved by both of the Debtor's members.  At the time, Terra Venture had a

2

contract to buy approximately 20 acres of land at the southeast corner of 135th Street and Mission Road in Leawood, Kansas, for almost $5 million.

Under the Debtor's Operating Agreement,[1] Schedule B was labeled "Business Plan." It noted the Terra Venture contract and said the Debtor's managers were to contract with professionals to develop a site plan for retail and office uses and obtain zoning to allow such uses. Once the site plan and zoning were approved, the Debtor was to purchase the property under the Terra Venture contract, which was assigned to the Debtor. Those approvals were obtained and in October 2005, Bentley IV supplied enough cash to enable the Debtor to obtain a loan to buy the 20 acres. The Debtor took out a loan, bought the property, and named it "Mission Corner," mortgaging it as security for the loan. Schedule B provided that a licensed real estate broker (an affiliate of Terra Venture) was to immediately begin marketing the property in whole or in parts at prices specified in Schedule F of the Operating Agreement.

At trial, the Debtor relied heavily on the last sentence of Schedule B, which reads: "The intent of the Managers is to sell the land as fast as reasonably possible and for the most money as can reasonably be expected." The Debtor argued this statement of its business plan meant the Debtor did not intend to build infrastructure on the property, probably a plausible reading. But the plan can also be read not to exclude the possibility that infrastructure would be necessary in order to sell the land "as fast as reasonably

---

[1]Admitted into evidence as Debtor's Exhibit 6; also marked as Village's Exhibit 402.

3

possible and for the most money as can reasonably be expected."   Furthermore, Schedule F included a sentence reading:  "In the event some infrastructure improvements are required for the sale of land, then the Members shall use a portion of the sale proceeds to pay for the costs[;] however the Members must approve any sale where the sale price, less the infrastructure costs, is less than the Minimum Sale Price."  Thus, when they signed the Operating Agreement, both Terra Venture and Bentley IV clearly recognized that some infrastructure might have to be built in order for the Debtor to sell the property.

Schedule F of the Operating Agreement provided for an affiliate of Terra Venture that was a licensed real estate broker ("the Broker") to act as the listing agent who would try to sell either all or parts of Mission Corner for the Debtor.  The listing agreement was to last three years.  The Operating Agreement specified an asking price for retail lots of $15 per square foot, and for office lots of $12 per square foot.  A bulk selling price of $9.50 per square foot was specified for any sale of at least 8 acres.  The Broker was to market the property for the asking prices, but was authorized to sell property for as little as 80% of those prices without the consent of the Debtor's members.  The asking and bulk selling prices were gross prices from which commissions and closing costs were to be deducted, and if infrastructure improvements were required to sell the land, the Debtor's members had to approve any sale where the sale price minus the infrastructure cost was less than 80% of the asking price.  As stated earlier, this indicates the parties had at least some inkling that infrastructure improvements might have to be made in order to sell any of the land, despite the fact the business plan did not expressly include any

4

reference to such improvements.  The asking prices and the bulk selling price were to

increase by $1 per square foot in the second year of the listing agreement, and another $1

in the third year.  Another affiliate of Terra Venture was authorized to purchase lots at

any time for 80% of the asking prices, but if no sales occurred in the first six months,

could acquire lots for 70% of the asking prices.  The starting date for the listing

agreement was October 5, 2005, when the Debtor closed on its purchase of the land.[2]

As indicated, Turner and Sweeney were the Debtor's initial managers.  They had a

development plan and a plat prepared for Mission Corner.  In August 2005, the City of

Leawood ("the City") rezoned Mission Corner from agricultural use to planned

neighborhood retail use, and approved the Debtor's preliminary site plan and preliminary

plat for the property.

In January 2006, the Debtor submitted an application to modify the rezoning and

the preliminary site plan and preliminary plat for Mission Corner, and the City approved

the application by an ordinance passed in May 2006.  This changed the zoning to mixed

use, and authorized up to 160,000 square feet of commercial construction and 155,400

square feet of residential construction on the property.  The ordinance required the Debtor

to make specified road and utility improvements before any building in the Mission

Corner development could be finally occupied.

No part of Mission Corner was sold during the first six months of the listing

---

[2]Debtor's Exhibit 126, state court trial testimony of Stephen Seat at 32-33.

agreement.  During the next six months, in June 2006, the Debtor sold a retail lot,

designated on the preliminary plat as "Lot 4," to Village for $10.50 per square foot, or a

total price of $607,908.  Sweeney was the only person who signed the sale contract ("Lot

4 Sale Agreement").[3]  In an email message, a representative of Bentley IV approved

having Sweeney sign for both parties to the sale.  The Broker was paid a commission of

about $36,000 from the proceeds of the sale, and about $567,000 was paid on the

Debtor's mortgage loan.  The Debtor has conceded this transaction was affirmatively

approved by Bentley IV and Terra Venture, even though it appears to have satisfied the

conditions set out in Schedule F of the Operating Agreement for selling the lot without

further consent from the Debtor's members.  Lot 4 contains 57,896 square feet and is

surrounded by the rest of the Debtor's Mission Corner property, which contains 641,804

square feet.[4]  Utility easements and internal roadways to serve Lot 4 would lay on or

across the Debtor's property.

   The Lot 4 Sale Agreement contained two paragraphs that are important for the

remaining claims in this suit.  Paragraph 20 provided Village and the Debtor would make

an agreement in the future dealing with easements for access, parking, and other

---

[3]Sweeney signed for both the Debtor and Village as "Trustee, Member," although he was not personally a member of the Debtor and his trustee position was not explained at trial.  However, the Debtor concedes the sale complied with the Operating Agreement, so any questions about Sweeney's status with the Debtor and Village in signing the Lot 4 Sale Agreement have played no part in the Court's decision.

[4]Different square footage numbers sometimes appear in the record, for example, in the appraisals described below, but the numbers used here are those accepted by a state court in a bench trial held before it.  The variance in the numbers is not large, and the numbers stated in the text are close enough for the Court to decide the remaining issues in this case, even if they are not exactly correct.

purposes, and paying for maintenance of common areas; it read:

> The parties agree to enter into an agreement related to the [Lot 4] Property and the remaining portion of the proposed plat of Mission Corner owned by [Debtor] (the "Adjoining Property") which shall provide for (a) non-exclusive, mutual cross easements for ingress, egress and parking over and across all portions of the [Lot 4] Property and the [Debtor's] Adjoining Property improved from time to time for such purposes; (b) non-exclusive, mutual cross easements for utilities and storm drainage and detention, (c) restrictions against uses inconsistent with a first-class residential/commercial development, (d) maintenance, repair and replacement and insuring of all of the common areas on the [Lot 4] Property and the [Debtor's] Adjoining Property, including, but not limited to, private streets, parking areas and detention and landscape areas and prorata payment by [Village] and the owner from time to time of the [Debtor's] Adjoining Property of the costs of the same based on land square footage, (e) prorata payment (based on land square footage) by [Village] and the owner from time to time of the [Debtor's] Adjoining Property of costs assessed to the [Lot 4] Property and the [Debtor's] Adjoining Property under any agreement for maintenance of private street[s], and (f) such other matters as are agreed to by the parties.

Paragraph 21 concerned the construction of infrastructure for Mission Corner; it read:

> With respect to the development of the real estate which is the subject of the proposed plat of Mission Corner, [the Debtor] and [Village] agree as follows:

>> A. All owners of the real estate comprising Mission Corner shall pay when due their respective prorata shares, based on land square footage, of the costs of public and private improvements incurred in connection with the development of Mission Corner, the cost of fees associated with filing a plat of the Mission Corner, the cost of construction of any private or public road, turn lanes as may be required, assessments for the widening of Mission, if any, and all utilities required to serve Mission Corner.

>> B. [The Debtor] and [Village] shall agree on a grading plan for grading of Mission Corner. [The Debtor] and [Village] acknowledge that Mission Corner will be developed as a

7

single, unified development, including not only grading, but
construction of streets and utilities as well. [The Debtor] and
[Village] agree to pay when due their respective prorata
shares of the cost of such construction, based on land square
footage. In connection with the unified development of
Mission Corner, each owner of real estate therein contained
must agree to grant any utility easements required in order to
extend utility lines.

In prior litigation between the Debtor and Village, a Kansas state court ruled the parties intended for the Lot 4 Sale Agreement to require the Debtor to proceed with construction of infrastructure for the Mission Corner development, and to complete and file the final plat for the development. The state court explicitly rejected the Debtor's argument that the Lot 4 Sale Agreement should be construed to mean the parties intended that the Mission Corner property might never be developed. The Lot 4 Sale Agreement clearly modified the business plan stated in the Operating Agreement, to the extent it might have been necessary, to provide that the Debtor would build infrastructure for the Mission Corner development. It also modified the Schedule F provision about paying for the infrastructure from the sale proceeds to instead require Village to pay a pro rata share of the infrastructure costs in addition to the $607,908 sale price. In effect, this modification allowed the parties to ignore the infrastructure costs in determining whether the price Village was paying satisfied the price set in Schedule F.

In October 2006, the Debtor obtained an estimate of the cost, based on preliminary plans, to build the private infrastructure for the Mission Corner development. The estimate was almost $2.5 million, but that was later reduced to just under $2 million

8

because fill dirt was available from another site, and a retaining wall and water feature were eliminated. The Debtor hired a construction company to do some grading and other infrastructure work, and that company obtained a grading permit late in December 2006.

Along with the estimate for the private infrastructure, the construction company gave the Debtor an estimate of the cost to build public infrastructure for the Mission Corner development. This mainly concerned building or modifying public roads that would surround the development, carrying traffic to and from it. That estimate was $1.573 million. Bernie Shaner, an appraiser hired by a bank from which the Debtor hoped to obtain financing, testified that such public infrastructure was normally paid for up front by the local government through bonds which would be repaid over time from sales tax revenue.

In May 2007, a significant change in the Debtor's operations occurred. Paragraph 9.7 of the Debtor's Operating Agreement established a reciprocal buy-sell option for Bentley IV and Terra Venture. Under it, Bentley IV could force Terra Venture to choose either to buy Bentley IV's half of the Debtor or sell its own half to Bentley IV, and Terra Venture could do the same to Bentley IV. On May 29, 2007, Bentley IV served Terra Venture with a letter exercising this option. Terra Venture had sixty days to choose whether to buy or to sell.

On July 23, 2007, shortly before Terra Venture's decision about the buy-or-sell demand was due, the Debtor and Village signed a document called the "Mission Corner Declaration of Covenants, Restrictions, Easements, Reservations and Assessments" ("the

9

Declarations") which was filed two days later with the Johnson County Register of Deeds. Turner signed this document as a manager of the Debtor, and Sweeney signed it as a member of Village. The Declarations say when the "Developer" (who is the Debtor) sells a lot to a third party, the Developer will begin and diligently proceed with all infrastructure improvements required for a certificate of occupancy to be issued for a building to be built on the lot. Like the Lot 4 Sale Agreement, the Declarations provide that each buyer of a lot in Mission Corner is to reimburse the Developer for a pro rata share of the costs of all public and private infrastructure and other common improvements incurred in developing Mission Corner. The Declarations clearly address the obligation imposed on the Debtor by ¶ 20 of the Lot 4 Sale Agreement to reach an agreement with Village providing for cross-easements and other covenants necessary for the development of Mission Corner. The Debtor's attack on the filing of the Declarations seems to be limited to a complaint that the Declarations imposed obligations on it to build infrastructure for Mission Corner. But as the state court concluded, the Lot 4 Sale Agreement had already imposed such obligations on the Debtor. The Debtor has not suggested it gave up any other value as a result of the filing of the Declarations. In fact, had the Debtor refused to reach an agreement like the Declarations, Village would have had a colorable claim against it for breaching ¶ 20 of the Lot 4 Sale Agreement.

On July 27, 2007, Terra Venture chose to sell its interest in the Debtor to Bentley IV. The Operating Agreement called for the closing on this transaction to occur within 30 days, and on August 14, Bentley IV became the sole owner of the Debtor.

10

In the summer of 2007, representatives of Bentley IV told the construction company that was working on the Mission Corner infrastructure that they had taken over as managers of Mission Corner, and the company would no longer be dealing with Turner or Sweeney.  Later, they told the company to stop the infrastructure work on the development.  At that time, the rough grading and erosion control had been completed and some temporary fencing had been installed.  After that, the Debtor refused to take any further action to get the final plat for Mission Corner filed or to install any infrastructure.

In October 2006, a bank hired Shaner's company to appraise Mission Corner in order, as Shaner understood it, for the bank to decide whether to make a loan to the Debtor.  In fact, an email message sent by Stephen Seat, a representative of Bentley IV, shows that he asked the bank to hire Shaner to do the appraisal.  Seat also said, "We will be seeking further financing to accommodate site improvements," and wanted the appraiser to determine the value of the property "in its as-is condition as well as the value of the site as improved (all infrastructure completed and sales estimated over an absorption period)."  Shaner testified about two appraisals (as well as several drafts) his company prepared for the development.

A Shaner appraisal report dated December 4, 2006, estimated the value of the Debtor's remaining portion of Mission Corner (excluding Village's Lot 4) as of Octoer 19, 2006, to be $4.63 million "as is," and $11.33 million "as if developed" (during his

11

testimony, he sometimes referred to this as the "as developed" value).[5] Shaner explained the property had not been developed by October 19, 2006, but was simply plowed ground. This appraisal considered the Debtor's property to contain 616,810 square feet. The "as if developed" value was predicated on completion of improvements according to the plans and specifications provided to Shaner, and used a valuation date of March 15, 2007, the estimated completion date of the proposed site improvements. The appraisal was prepared for M&I Bank, a bank where the Debtor had applied for a loan to pay for building the infrastructure needed to develop Mission Corner. Shaner explained that this appraisal valued only the Debtor's part of Mission Corner because it was prepared after the Debtor had sold Lot 4 to Village.[6] The appraisal would likely have enabled the Debtor to borrow against the expected "as developed" value of Mission Corner in order to pay for the infrastructure construction.

Shaner's December 4, 2006, appraisal of the Debtor's portion of Mission Corner in as-is condition was based on a value of $7.50 per square foot, with no indication the appraiser thought any portion of Mission Corner in its as-is condition was worth more than any other portion. This would be so because the infrastructure necessary to build on the land in accordance with the Debtor's plan and plat had not yet been constructed in

---

[5]This appraisal was Village's Exhibit 410, which was admitted into evidence. Several other appraisals as of October 19, 2006, but dated before December 4, 2006, were shown to Shaner at trial, and he explained they were all drafts. When he was asked why his company had not marked the earlier appraisals to show they were drafts, he said, "We do now."

[6]He testified some of the materials for the development referred to Lot 4 as "Lot D," but he understood both names to be referring to the part of Mission Corner that Village bought.

October 2006. Shaner's appraisal would therefore indicate Lot 4, which contained 57,896 square feet, was worth $434,220 in its as-is condition as of October 19, 2006. Nothing presented at trial suggested the value of any part of the Mission Corner property would have changed between June and October of 2006. Consequently, Shaner's appraisal provides strong evidence that the $607,908 Village paid for Lot 4 in June 2006 was not less than reasonably equivalent to the lot's value at that time.

**Discussion**

**1. Applicable law and burden of proof.**

The Debtor claims that under the Kansas Uniform Fraudulent Transfer Act[7] certain types of its creditors could avoid both the Lot 4 Sale Agreement and the filing of the Declarations as transfers made or obligations incurred for less than reasonably equivalent value. It relies on two UFTA provisions. The first, K.S.A. 33-204(a), provides:

> (a)   A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> . . .
> (2)   without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> > (A)   Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > (B)   intended to incur, or believed or reasonably should have believed that such debtor would incur, debts beyond such debtor's ability to pay as they became

---

[7]K.S.A. 33-201 to -212.

due.

The second, K.S.A. 33-205(a), provides:

> (a)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

K.S.A. 33-207(a) provides that a creditor attacking a transfer or obligation may obtain avoidance of the transfer or obligation to the extent necessary to satisfy its claim, and K.S.A. 33-207(b) provides that if the creditor has a judgment against the debtor, the court may allow the creditor to levy execution on the transferred asset or its proceeds. Section 544(a)(1) and (a)(2) of the Bankruptcy Code authorize a debtor-in-possession like the Debtor to avoid transfers and obligations that its creditors would be able to avoid under applicable state law like the UFTA (whether or not such creditors actually existed). So the Debtor had to show the Lot 4 Sale Agreement and the Declarations satisfied the criteria of K.S.A. 33-204(a)(2) or K.S.A. 33-205(a) in order to avoid those transfers under § 544(a)(1) or (a)(2).

The Kansas version of the UFTA does not say anything about the burden of proof. However, in *McCain Foods v. Central Processors*, Kansas Supreme Court looked to a case decided before the UFTA's adoption to determine the burden of proof under the

Case 09-06099    Doc# 167    Filed 04/27/12    Page 14 of 21

UFTA.[8]  The court stated that, in Kansas, "[t]he general rule is, of course, that fraud is never presumed and must be established by clear and convincing evidence.  The burden of establishing fraud is upon the party asserting it."[9]  "Clear and convincing evidence is not a quantum of proof, but rather a quality of proof; thus, the plaintiff establishes fraud by a preponderance of the evidence, but this evidence must be clear and convincing in nature."[10]  Although *McCain Foods* concerned the burden of proof for a claim of a fraudulent transfer made with the actual intent to hinder, delay, or defraud a creditor, this Court sees nothing in the structure or purpose of the UFTA that suggests the burden of proof should not likewise rest on the party attacking a transfer as having been constructively fraudulent because it was made for less than a reasonably equivalent value. "There is nothing in the Bankruptcy Code to indicate that Congress meant to displace state law standards of proof when the estate seeks to avoid a transaction under section 544" in reliance on state law.[11]  Accordingly, in order to prevail, the Debtor had the burden to prove the transfers it is attacking were avoidable.

**2.  The Debtor failed to show that it received less than a reasonably equivalent value in return for the sale of Lot 4 to Village.**

---

[8]  *McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, 12-13 (2002) (*citing Koch Engineering Co. v. Faulconer*, 239 Kan. 101 (1986)).

[9] *Koch Engineering Co. v. Faulconer*, 239 Kan. at 107, 716 P.2d at 186.

[10]  *Newell v. Krause*, 239 Kan. 550, 557, 722 P.2d 530, 536 (1986).

[11] *In re Jackson*, 318 B.R. 5, 12 (Bankr. D.N.H. 2004) (avoidance action under New Hampshire Uniform Fraudulent Transfer Act).

The Debtor did not suggest the $607,908 price Village paid for Lot 4 was itself insufficient. Instead, at times, it argued that in the Lot 4 Sale Agreement, it not only transferred Lot 4 but also took on the obligation to build the infrastructure included in the Mission Corner plan and plat, and asked the Court to determine the value it received for the transfer of Lot 4 by subtracting from the price Village paid the estimated cost of building both the private and public infrastructure for the development. This calculation gives a result of almost negative $3 million, which would establish the transfer was made for less than a reasonably equivalent value — if it were a proper way to determine what the Debtor received and what it gave up in the transaction. Attributing the cost of all the infrastructure for Mission Corner solely to Lot 4 would make sense if only Lot 4 would have benefitted from such construction. But it clearly is not a proper way in this case to determine what the Debtor gave up in the sale of Lot 4 because building the infrastructure would have benefitted not only Lot 4 but also the rest of Mission Corner, all of which the Debtor still owned after it sold Lot 4.

At other times, the Debtor suggested attributing a pro rata share of the projected private and public infrastructure costs to Lot 4 based on the fraction of the total square footage of Mission Corner that it contained, and subtracting that figure from the sale price to determine whether the sale resulted in a net loss for the Debtor. This method follows the method specified in Schedule F of the Debtor's Operating Agreement for determining whether a proposed sale price met the price minimums set in that schedule.

The Shaner appraisal dated December 4, 2006, said the Debtor's Mission Corner

16

property contained 616,810 square feet, or 14.16 acres. Shaner testified this square footage was the amount of property left after deducting Lot 4 and the areas that would be used for public roads under the Debtor's development plan. The Lot 4 Sale Agreement says Lot 4 contains 57,896 square feet. This means 674,706 square feet were available for development after setting aside the areas to be used for public roads. Under these figures, Lot 4 comprised approximately 8.6% of the part of Mission Corner that could be sold for development. The estimated cost of the private and public infrastructure for Mission Corner was approximately $3.57 million, 8.6% of which is $307,000. Attributing only this reasonable share of the infrastructure cost to Lot 4 and, as the Debtor proposes, subtracting it from the Lot 4 sale price would show the Debtor received only $300,000 for Lot 4. However, the evidence indicated the Debtor would probably not have to pay up front to build the public infrastructure, which would instead be financed by the City and repaid over time. The private infrastructure the Debtor would have to pay for immediately was estimated to cost almost $2 million, so Village's share would have been about $172,000. Subtracting only that amount from the price Village paid would show the Debtor received only $435,908 for Lot 4.

But as Village points out, under the Lot 4 Sale Agreement and the Declarations, Village was obliged to pay in addition to the $607,908 sale price a pro rata share of the infrastructure costs based on the square footage of Lot 4. Consequently, it would not be reasonable to subtract that pro rata amount from the price paid for Lot 4 to determine what the Debtor received in return for Lot 4. Furthermore, Shaner's December 4, 2006,

17

appraisal of the Debtor's portion of Mission Corner concluded the property was worth $7.50 per square foot. Applying this value to Lot 4 would give a value for its 57,896 square feet of only $434,220, much less than Village paid for it; in fact, it is almost the same as the amount that results from subtracting the private infrastructure cost from the price Village paid.

The Debtor's approaches of charging either some or all of the infrastructure cost against the price Village paid to Lot 4 also asks the Court to ignore the fact building the infrastructure would have benefitted not only Lot 4, but also all the other lots in the Mission Corner development, all still owned by the Debtor after Lot 4 was sold. According to Shaner's December 4, 2006, appraisal, on October 19, 2006, the Debtor's share of Mission Corner in "as is" condition was worth $4.63 million, and in "as if developed" condition (that is, if the infrastructure were built in accordance with plans and specifications the Debtor supplied to Shaner) would have been worth $11.33 million. In other words, if the Debtor had performed its promise to Village to build the infrastructure, the value of the property the Debtor retained in Mission Corner would have substantially increased — in fact, more than doubled in value. Since building the infrastructure would have greatly increased the value of the Debtor's part of Mission Corner and Village was obliged to pay a reasonable share of the infrastructure costs, the Court concludes it is not reasonable to deduct any part of the infrastructure costs from the money Village paid for Lot 4 to determine whether the Debtor received reasonably equivalent value in return for transferring the lot to Village.

18

Besides the evidence provided by the Shaner appraisal, the Debtor's own Operating Agreement, signed when Bentley IV was still on friendly terms with Terra Venture, Turner, and Sweeney, also gives some indication that the price Village paid for Lot 4 was reasonably equivalent to the lot's value. In Schedule F to the Operating Agreement, Terra Venture and Bentley IV set asking prices for the various building lots in the Mission Corner development, and agreed the listing agent could sell any of them for 80% of the price they specified. This shows that when they signed the Operating Agreement, they both thought 80% of the asking prices would be reasonably equivalent to the value of any of the Mission Corner lots. Furthermore, they agreed if no lots were sold for 80% of the asking price within six months, a Terra Venture affiliate like Village could buy one or more lots for 70% of the asking price. Village suggested at trial this discount was to compensate the Debtor's managers for the work they did to prepare Mission Corner for development, including obtaining zoning changes, preparing the plat and the development plan, and other activities. There was also some suggestion that the first buyer of a lot in a new development is taking the most risk that the development will somehow fail, and therefore a discount might be required to convince the first buyer to take the plunge. The Court concludes that Schedule F indicates the parties thought 70% of the asking price would be a reasonable price for the first lot sold in the development.

**2. Other than the obligation to build infrastructure on Mission Corner, which it had already incurred in the Lot 4 Sale Agreement, the Debtor has not identified any obligation it incurred or other value it gave up when its managers signed and filed**

19

**the Declarations. In addition, the Declarations satisfied an obligation the Debtor took on in the Lot 4 Sale Agreement to reach an agreement with Village for easements, use restrictions, and common area maintenance.**

The Debtor presented no evidence identifying any obligation it incurred or other value it gave up by the signing and filing of the Declarations, other than the obligation to build infrastructure that the Lot 4 Sale Agreement had already imposed on it. In addition, the Lot 4 Sale Agreement had obligated the Debtor to reach an agreement with Village providing for (1) easements for ingress and egress, utilities, and storm drainage and retention, (2) restrictions on uses of the lots in Mission Corner, and (3) payment for common area maintenance. The filing of the Declarations satisfied that obligation. Without the Declarations, Village would have had a cause of action for breach of contract if the Debtor had unreasonably refused to agree to the Declarations or some similar arrangement. This means the Declarations potentially saved the Debtor from incurring a liability. Furthermore, subjecting Mission Corner to easements, restrictions, and covenants like the Declarations brought Mission Corner one step closer to having the as-developed value estimated in the Shaner appraisal. The Court concludes the satisfaction of the Debtor's obligations under ¶ 20 of the Lot 4 Sale Agreement constituted value reasonably equivalent to any unidentified obligation the Debtor might have incurred or value it might have given up by agreeing to the Declarations.

**4. The Court finds it unnecessary to decide whether the Debtor showed the other requirements under K.S.A. 33-204(a)(2) or 33-205(a) were satisfied.**

In order to avoid the transfer of Lot 4 to Village or any obligations imposed on it when the Declarations were filed, the Debtor had to show not only that it received less than reasonably equivalent value in those transactions, but also that its remaining assets either were unreasonably small in relation to a business or transaction it was going to engage in, or it intended to incur or should have believed it would incur debts beyond its ability to pay as they became due, or that it was insolvent at the time of the transactions or became insolvent as a result of the transactions. Having concluded that the Debtor failed to failed to show that it received less than reasonably equivalent value in either transaction, the Court finds it unnecessary to consider whether those other elements of the Debtor's avoidance claims were satisfied.

**Conclusion**

For these reasons, the Court concludes the Debtor has failed to establish that it can avoid either the sale of Lot 4 to Village or the filing of the Declarations for Mission Corner. This ruling determines the only claims remaining in this proceeding.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by Bankruptcy Rule 7058 and Civil Rule 58(a).

# # #